UNITED STATES of America,
Defendant-Appellee,

v.

James L. IVEY, Plaintiff-Appellant.

No. 26668

Summary Calendar.

United States Court of Appeals
Fifth Circuit.

July 23, 1969.

Towner Leeper, El Paso, Tex., for appellant.

Marvin T. Butler, U. S. Atty., El Paso, Tex., Lee A. Jackson, Atty., Johnnie M. Walters, Asst. Atty. Gen., Harry Marselli, Jr., Harry Baum, Edward Lee Rogers, Attys., Department of Justice, Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Pursuant to new Rule 18 of the Rules of this court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part I.

This litigation involves the 1959 tax liability of the appellant taxpayer James

L. Ivey, a cash basis taxpayer who is a cotton farmer in the lower El Paso Valley, Texas. The appeal concerns income tax in the amount of $8,665.13 for that year, plus interest. Taxpayer filed his complaint in the District Court for a refund and the Court, sitting without a jury, found adversely to taxpayer.

During the years 1954 through 1959, James L. Ivey farmed cotton in the El Paso Valley. After harvesting his cotton crop in the Fall of the year, he would enter into a contractual relationship with R. T. Hoover & Company, Inc., a cotton brokerage firm in El Paso for the marketing of his cotton. Insofar as is relevant here, the contracts, between Ivey and Hoover for each of the years 1955 through 1959 were substantially the same. The contract covering taxpayer's 1957–58 season provided as follows:

In consideration of your [R. T. Hoover & Company's] handling my 1957/58 cotton, I [taxpayer]- hereby irrevocably appoint you as my agent with full authority to move to the Compress or Warehouse of your selection my 1957/58 cotton as it is harvested and ginned, with warehouse receipts to be held by you as collateral for advances which you may make to me or for my account, from time to time, and to be pledged by you to Banks or other institutions to secure repayment of monies in whatever amount they may advance you thereon; to place said cotton in the Government Loan; with all the authority to you in handling and disposing of said cotton the same as though you were the absolute owner thereof, such handling and conversion to be either through you direct or through Assigns.

You are to insure my cotton against loss from the time it becomes a bale and all charges such as drayage, freight, compression, compress receiving and loan charges, as well as any amounts advanced to me by you, are to be charged to my account with you, and shall bear interest at the rate of 5¼% per annum; and are all to be paid by me to you when my cotton is sold or placed in the Government Loan. It is understood and agreed that the price so paid me will at least equal the Government Loan value, less handling charges.

You are authorized to buy, and I hereby agree that you may buy, without notice to me, all, or any part of, my cotton for use in the fulfillment of sales made by you from time to time under your Suspense arrangement with me and others.

In the event you place all, or any part of, my cotton in the Government Loan, I understand that you will try to find outlets for it through trade channels; and you may do so with the asurance and guarantee that I will repossess it in accordance with Commodity Credit Corporation regulations and make the cotton available to you for the fulfillment of the commitments you have made.

These contracts were the only contracts entered into between taxpayer and Hoover for the years 1955 through 1959.

The taxpayer would plant his cotton in April of each year, harvesting would begin in August, and most of the cotton would be harvested in December. He incurred expenses for land preparation and in producing the cotton—for planting, cultivating, fertilizing, and watering it—and he deducted those expenses in the years in which they were incurred and paid. After the cotton was ginned, at taxpayer's expense, it was delivered to Hoover, which acted as taxpayer's agent under the contracts. As provided in the contracts, Hoover would deliver the cotton received from taxpayer to warehouses of its selection and obtain warehouse receipts therefor in taxpayer's name. The company would use the warehouse receipts as collateral to obtain loans. Then, as the taxpayer needed funds, he was entitled to request advances from the company and the company would use, among other sources, such loan proceeds to make such ad-

vances. The company would advance cash to the taxpayer equal to the amount of the Government loan value of his cotton crop that he had delivered to the company, less a fee or charge of $3.00 per bale of cotton, to cover expenses incurred by the company. The same practice was followed by the company with respect to the other cotton growers using its services. After the company sold the taxpayer's cotton on his behalf, it would make a final settlement with the taxpayer in which it would remit to the taxpayer the sales price received for the cotton, less the company's commission, less expenses it had incurred, and less the advances previously received by taxpayer.

While the company would not normally make advances in excess of Government loan value and that situation did not arise in the years involved, if Hoover made advances to growers in excess of the Government loan value of their crops delivered to the company (as it did in later years), and subsequently sold their crops for less than such advances, Hoover would be entitled to recover the difference from such growers. Where the advance was not greater than the Government loan value, the company would never have occasion to recover the advance because it would always be able to sell the cotton for such loan value.

In addition to the charge of $3.00 a bale imposed by the company on the growers, and enumerated in the final settlement sheets, Hoover also reserved the right to charge for its actual expenses referred to in the contracts. Such expenses, however, would not be enumerated in the "settlement sheet with the grower" because they simply represented fixed amounts that reduced "the proceeds of the total sale". One of those expenses not wholly reflected in the $3.00 per bale charge was interest on advances; inasmuch as Hoover incurred interest expenses itself on the money it borrowed to make such advances, it would make a separate or "internal" interest charge against the "whole pool"

proceeds to cover such expenses. In that manner, a grower who received advances was charged interest thereon indirectly.

The Hoover company would hold the cotton until it was able to sell it, usually directly to mills, on behalf of the growers. To the extent that the cotton was not sold, the company had the authority "as the agent for the grower" to place the cotton in the Government loan program, up until April 30th of the year following the harvest. Thereafter, for a specified period of time, the grower could redeem the cotton by paying back the Government loan, plus interest and handling charges. If the cotton was not placed for a Government loan and was not sold by the company for the grower, then the company would purchase the cotton itself after the end of its fiscal year on June 30th. None of the cotton sales involved here were placed in the Government loan program.

As soon after June 30th of each year as was practical, the Hoover company made final settlement with each grower for the sales it had made on the grower's behalf. Instead of keeping account of the individual bales of cotton delivered by each grower, account was kept of the quantity and quality of each grower's cotton, including the particular geographical area in which it was grown, and the settlement was based on the price the company obtained for such class of cotton. Each grower thereby received the price obtained for his class of cotton, less the expenses referred to above reducing the entire proceeds, less what the company considered a reasonable profit for its services, and less the $3.00 per bale charge shown on the settlement sheets, and certain other specified charges. The time of final settlement and the manner in which it was done was controlled by the company, and the final settlement was made after June 30th of the year following the harvest of the prior Fall.

During the years 1955 through 1959, taxpayer reported the advances described above that he received from Hoover pursuant to the contracts referred to above

as income for the years in which he received them, as follows:

| Year | Advances |
|------|----------|
| 1955 | $39,800. |
| 1956 | 46,100. |
| 1957 | 41,000. |
| 1958 | 56,000. |
| 1959 | 10,000. |

The Commissioner eliminated those advances from income in the years received on the ground that they did not represent receipts from completed sales transactions and included them in income for the years in which the cotton on which the advances were received was sold by Hoover. Those adjustments resulted in changes in the taxpayer's cotton sales for each of those years, as follows:

## COTTON SALES

| Year | As reported in Taxpayer's return (including advances) | As adjusted by the Commissioner |
|------|------------------------------------------------------|----------------------------------|
| 1955 | $39,800.00 | –0– |
| 1956 | 58,230.40 | $51,930.40 |
| 1957 | 64,975.80 | 70,075.80 |
| 1958 | 97,863.02 | 82,863.02 |
| 1959 | 62,221.30 | 108,221.30 |

The Commissioner's adjustments resulted in a loss for 1956, which was carried back to 1954 and 1955 and forward to 1957, 1958, and 1959. The result of the foregoing adjustments was the following overassessments and deficiency:

| | Deficiency | Overassessment |
|------|------------|----------------|
| 1955 | –0– | 918.71 |
| 1956 | –0– | 5,189.16 |
| 1957 | –0– | 3,408.29 |
| 1958 | –0– | 4,086.57 |
| 1959 | $23,416.97 | –0– |
| Totals | $23,416.97 | $13,602.73 |

The foregoing adjustments and determinations were effected or made possible, in part, by an "Agreement as to Determination Pursuant to Section 1313 (a) (4) of the Internal Revenue Code of 1954" entered into by the taxpayer and the Commissioner on March 31, 1961.

The overassessments for the years 1955 through 1958 were credited against the deficiency for 1959, leaving a balance due thereon as of that date of $8,045.39.

The District Court sustained the Commissioner's determination that the advances received by taxpayer from Hoover, a cotton broker, were in fact advances from Hoover pending Hoover's sale of taxpayer's cotton as agent for taxpayer, not proceeds of sales of the cotton to Hoover. It is clear from both the terms of the written agreement between taxpayer and Hoover and the conduct of the parties that Hoover acted merely as taxpayer's agent in selling the cotton to third parties, not as a purchaser, and that Hoover's interim "advances" to taxpayer were in reality what they purported to be—interest bearing loans by a commodity broker pending the sale of the commodity on the owner's behalf.

The issue in the instant case is whether the advances in question, when received by taxpayer from the Hoover company, were, as they purported to be, advances or loans, as contended by the Government, or partial sales proceeds, as contended by taxpayer. Sales proceeds received by a taxpayer, whether he is on the cash or accrual basis for reporting income, are includable in his gross income in the year received. Hagen Advertising Displays, Inc. v. Commissioner of Internal Revenue, 407 F.2d 1105 (6 Cir., 1969). Where, however, the advance payment, though made by a customer, is in the nature of a loan or financing arrange-

ment, such as the instant case, pending a future sale, no income is realized upon the receipt thereof. Thompson v. Commissioner of Internal Revenue, 322 F.2d 122, 129–130 (5 Cir., 1963); Consolidated-Hammer Dry Plate & Film Co. v. Commissioner of Internal Revenue, 317 F.2d 829, 832 (7 Cir., 1963).

Taxpayer complains that the District Court relied only on the Ivey-Hoover contract to determine the tax results without even considering what actually and what was the substance of the transaction. He contends that the true intent of the parties was not only ignored but testimony regarding it was often excluded.

Taxpayer attempted to introduce evidence suggesting that he understood when he delivered the cotton to Hoover and received his advance payments, Hoover purchased the cotton at that time. According to taxpayer's interpretation of the transaction, at the time Hoover paid the minimum guaranteed price the cotton would bring on the market, namely, the Government loan value less $3.00 per bale handling charge, and agreed to pay the taxpayer an additional amount depending on what Hoover was able to obtain for the cotton on the market at a later time, Hoover, not the taxpayer, owned the cotton. He testified further that no interest was charged on the advances, and that, for all of the foregoing reasons, he treated the advances as sales income when received.

Such testimony contradicts the terms of the contract, including those providing that the Hoover company is only the taxpayer's selling agent and may buy the cotton when it has made sales commitments for it, but that Hoover was authorized to charge interest on the advances, and that Ivey agreed to repossess the cotton if necessary if it is placed in the Government loan program. The parol evidence rule would unquestionably apply in any litigation between Ivey and the Hoover company with respect to their rights and obligations under the terms of the contract. It has sometimes been broadly stated that the parol evidence rule has no application to any save the parties to the instrument. O'Shea v. N. Y. R. R. Co., (CCA 7) 105 F. 559. However, as when here the contract is executed as the final embodiment of the agreement and the parties abide by the instrument as they made it, the law and not their wish or understanding must control its legal effect on the incidence of taxation. See Pugh v. Commissioner of Internal Revenue, 49 F.2d 76, 79 (5 Cir., 1931).

Taxpayer's reliance on Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939) and Bankers Mortgage Co. v. Commissioner, 141 F.2d 357, (5 Cir., 1944), affirming per curiam 1 T.C. 698 (1944), cert. den. 323 U.S. 727, 65 S.Ct. 61, 89 L.Ed. 583 (1943), is misplaced. In Helvering v. Lazarus, supra, at page 255, 60 S.Ct. at page 210, it was held that a transfer of property with a leaseback was a loan secured by the property primarily because of the "established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money". There is no comparable doctrine which warrants treatment of advances by a cotton broker-selling agent as sales proceeds or conversion of the principal-agent relationship to one of seller-buyer. In the *Bankers Mortgage* case, it was the Commissioner who successfully challenged the form of the transaction and relied on its substance; here, the form and substance of the transaction coincide.

The other cases relied on by taxpayer dealing with the sale-versus-loan question turned on their own particular facts as must the instant case.

Taxpayer's contention that treatment of the advances received from Hoover as loans, rather than sales proceeds, would distort his taxable income, begs the very point at issue. On the contrary, to treat what are in fact loans as sales would distort taxpayer's income.

Having chosen to sell his cotton through Hoover as agent, and to receive advances from Hoover pending the sales,

and the sales having occurred when Hoover sold the cotton for taxpayer's account and made final settlement with taxpayer, taxpayer is in no position now to insist that Hoover's advances represented the sales proceeds.[1]

Judgment affirmed.

1. In Section 77 of the 1954 Code, Congress has provided tax relief for farmers obtaining loans on their crops from the Commodity Credit Corporation, by allowing them to elect to treat such loans as sales proceeds when received. See Thompson v. Commissioner of Internal Revenue, 322 F.2d 122 (5 Cir., 1963); United States v. Isaak, 400 F.2d 869 (9 Cir., 1968); DeHaven v. Commissioner of Internal Revenue, 36 T.C. 935, 938 (1961); Rev.Rul. 60–211, 196–1 Cum. Bull. 35, 36, I.T. 4016, 1950–2 Cum.Bull. 29. No contention is or can be made that taxpayer elected to dispose of this cotton in the manner provided in Section 77. Nor did taxpayer seek to use the "crop method" of reporting income, under which deduction of the entire cost of producing the crop must be deferred to the year of the sale. See Treasury Regulations on Income Tax (1954 Code), Sec. 1.61–4(c).