**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Diane G. LUFFRED,
Defendant–Appellant.**

No. 89–2106.

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1990.

**1012**

H. Michael Sokolow, Asst. Federal Public Defender, Roland E. Dahlin, II, Federal Public Defender, Houston, Tex., for defendant-appellant.

James L. Turner, Paula C. Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, POLITZ, and BARKSDALE, Circuit Judges.

POLITZ, Circuit Judge:

Diane Luffred appeals her convictions for conspiracy to commit bank fraud and the substantive charge of bank fraud in violation of 18 U.S.C. §§ 2, 371, and 1344. Finding that the jury's verdict was tainted by the presence of extrinsic evidence in the deliberation room, we reverse and remand for a new trial.

*Background*

In March 1988 Diane Luffred was named in two counts of a three-count indictment charging her with one count of conspiracy to commit bank fraud and one count of bank fraud, in violation of 18 U.S.C. §§ 2, 371, and 1344. Peter Luffred, her husband, was named in all three counts. Peter Luffred became a fugitive from justice; Diane Luffred was tried. The evidence adduced at trial disclosed the following scenario.

While employed as a sales agent in the real estate office of Aida Younis in 1984, Diane Papageorgiou met Peter Luffred, a self-styled real estate investor. They married in 1985 and Diane Luffred left Younis' employ. Also sharing space in Younis' office was Younis' brother-in-law, Farooq Samad, who later moved his insurance agency to another location. Although Diane Luffred purchased insurance from Samad she was never in his office. Peter Luffred, however, visited Samad's office frequently to use the telephone and discuss business, continuing to do so even after Samad moved.

Walter Inglhofer, a regional real estate representative for Goodyear Tire and Rubber Company, was contacted by real estate agent David Clendenning who suggested the Luffreds as potential developers for a new Goodyear service center. Peter Luffred telephoned Inglhofer and then wrote two letters, introducing himself and claiming to have developed $40 million worth of shopping centers. As a result of these contacts Inglhofer visited Houston on several occasions. During these visits he, Clendenning, and the Luffreds drove around Houston considering possible sites for a Goodyear service center. Peter Luffred repeatedly boasted of his wealth; Diane Luffred remained silent. She actively participated, largely as one knowledgeable about the Houston real estate market, in about half of the score or so subsequent meetings. During this period Diane Luffred suffered from both colon cancer and heart trouble, which apparently limited her involvement.

Having identified a 2.25–acre tract (the Fondren–Fuqua property) as a prospective location for the center, Diane Luffred contacted Carol Rochetti of Blue Ridge Associates, owner of the property. Rochetti informed her that the price was $2.50 per square foot, or approximately $245,000. Diane Luffred then visited Rochetti and introduced Peter Luffred as her husband and client. After their initial meeting Rochetti directed her correspondence to the

attention of Peter Luffred in care of Harvard Investments, a business he had registered in the assumed-name records.

At the initial meeting, Peter Luffred requested that Rochetti raise the price of the tract on the closing statement so that he could secure 100 percent financing for his construction costs. When Rochetti stated that the closing statement had to reflect the actual price Peter Luffred mentioned, in Diane Luffred's presence, that they could structure a "land flip," in which he would find someone to purchase the land from Blue Ridge, and that he would then purchase the land for a higher price.[1] Goodyear selected the Fondren–Fuqua tract and Peter Luffred signed a letter of intent to purchase the property. Two earnest-money contracts set up the flip transaction—Blue Ridge agreed to sell to Farooq Samad for $245,000 and Samad agreed to sell to the Luffreds for $441,000. Peter Luffred later informed Rochetti that he was substituting his mother, Frances Shetler, for Samad and new earnest-money contracts were executed.

Harvard Investments executed a proposed lease to Goodyear of a portion of what was to become the Fuqua Auto Mall. As the deal solidified, Neil Pummill, a loan broker, made a proposal on the Luffreds' behalf to Guido Piggott, president of United National Bank, seeking financing for the purchase and construction of the shopping center. Costs were estimated at $1.5 million. Peter Luffred was listed as the principal and the proposal contained the Goodyear lease and letters of intent to lease retail space from Cottman Transmission, a fast food store, an insurance agency, and a gold/silver investment office.

Piggott manifested an interest and requested more information. A series of meetings between Peter Luffred and Piggott ensued. As evidence of financial ability Peter Luffred furnished Piggott with copies of what he asserted to be his and his wife's individual tax returns for 1983 and 1984. According to these returns, Diane Luffred earned $79,247 in 1983 and $83,117 in 1984, while Peter Luffred earned, respectively, $91,714 and $99,419. The purported returns of Diane Luffred were unsigned. Evidence adduced at trial reflects no tax filings by Diane Luffred in those two years. There was no evidence, however, that her income level during those two years crossed the return-filing threshold. Diane Luffred did not participate in any of these meetings with Piggott and she personally furnished him no information.

United Bank opted to finance the project and agreed to finance a prompt purchase of the property for $441,000 subject to a supportive appraisal by an appraiser approved by the bank. Peter Luffred agreed to acquire a $100,000 certificate of deposit from the bank and to deliver same as collateral.

Piggott first met Diane Luffred at the closing, which also was attended by Rochetti, Peter Luffred, Frances Shetler, and Jane Holloway who conducted the closing. Shetler first purchased the property for $245,000 and then sold it to Harvard Investments for the amount of the loan, $441,000. Shetler immediately endorsed to her son the check for $193,962.34 she was given. The documents and checks needed to complete the transaction were all signed, at one sitting, by Piggott, Shetler, Rochetti, the Luffreds, and Holloway.

Peter Luffred deposited $125,000 of the check endorsed to him by his mother into an account of Harvard Investments; the remainder was placed in various joint Luffred accounts. Peter Luffred subsequently drew checks on these accounts. Of those checks two allegedly bear the signature of Diane Luffred, one for $30,000 and one for $8,000, both made out to "cash." The custodian of the bank records conceded that he did not know if Diane Luffred actually had signed the two checks because the signatures on the checks did not match the bank's signature cards.

Shortly after the closing the failure of the project to move forward alerted Piggott and Inglhofer. The letters of intent to lease some of the space proved fraudulent.

---

**1.** The government produced no evidence that the land-flip transaction was illegal; at oral argument it candidly conceded that it was not inherently illegal.

Peter Luffred disappeared. Diane Luffred's efforts to complete the project were unsuccessful and the bank foreclosed, seizing the property and taking the $100,000 certificate of deposit. The instant indictment followed.

The jury returned verdicts of guilty on both counts. The court suspended imposition of sentence, imposed four years probation, and ordered the statutory assessment of $100. During the pendency of this appeal Peter Luffred was apprehended. He pleaded guilty and was sentenced to consecutive terms of imprisonment for five and two years and ordered to pay the $100 statutory assessment and $56,086.16 in restitution.

### Analysis

A. The jury's consideration of extrinsic evidence.

██ Diane Luffred contends that her convictions must be reversed because the jury considered extrinsic evidence during its deliberation. Three times during trial the government sought to introduce into evidence a chart purportedly tracing, through deposits and withdrawals, the proceeds of the United Bank loan. The chart reflected the government's theory of the case and sought to tie Diane Luffred to each deposit and withdrawal made by Peter Luffred by listing her as an account-holder and authorized signer. The chart also depicted Diane Luffred as having signed the two checks that purportedly carried her signature, despite the fact that the authenticity of the signature was the subject of serious dispute.[2] Objections to admission of the chart into evidence were sustained each time it was offered by the government. Excluded from the evidence, the chart was used as a trial aid during the government's closing argument.

The jury began its deliberations. During a lunch break the jury asked the deputy marshal for the chart. The marshal imprudently gave it to them. The jury resumed its deliberations for about 30 minutes before the court's case manager became

aware of the marshal's action, retrieved the chart, and informed the trial judge, who then advised counsel of the error. The court denied a defense motion for mistrial for lack of a showing of prejudice and the defense requested a curative limiting instruction. The court complied by instructing the jury to disregard anything it may have learned from the chart but then added that the chart had been "supported by the evidence ... to a great extent or perhaps completely...."

It is firmly established in this circuit that a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room "unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *Llewellyn v. Stynchcombe*, 609 F.2d 194, 195 (5th Cir.1980) (citing *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970)). *See also Paz v. United States*, 462 F.2d 740 (5th Cir.1972), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 52 (1973). Prejudice to the defendant, therefore, is a rebuttable presumption; the government has the burden of proving the harmlessness of the breach. *United States v. Howard*, 506 F.2d 865 (5th Cir.1975). Relevant to this determination are the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant. *Llewellyn*, 609 F.2d at 195.

The government seeks to rebut the presumption of prejudice by arguing that the chart constituted nothing more than a summary of its evidence against Diane Luffred, that the defense referred to it in its own closing argument, and that the jury had only 30 minutes to consider its contents before it was taken from them. We are not persuaded.

The chart boldly manifested that Diane Luffred had signed two checks and then connected her to six other distributions by listing her as an authorized signer or a co-holder of the account. This graphic depiction of the government's theory of the case deliberately blurred the distinction be-

---

**2.** A comparison of the signatures on the checks and on the various signature cards filed in evi-

dence compels the conclusion that Diane Luffred's name was signed by Peter Luffred.

tween Diane Luffred's actual involvement in the distribution of the funds and her power to distribute them because she could draw checks on the accounts. That the jury specifically called for the chart satisfies the requisite proof of prejudice. The jury deemed it of value in its deliberations. Moreover, the court's limiting instruction did more to exacerbate rather than alleviate the situation. Diane Luffred is entitled to a reversal and a new trial.[3]

## B. Other issues on appeal.

Luffred raises other issues which merit discussion in the event the government determines to retry the case.

### 1. *Evidentiary rulings.*

■ Luffred contends that the district court erred in denying her access to Peter Luffred's FBI file detailing his actions as a confidential informant, arguing that the file was material to her defense theory that Peter Luffred was skilled in deceit and had used his conflict with the FBI to convince her of the legitimacy of his actions. Fed.R. Crim.P. 16(a)(1)(C). The court issued its ruling following an *in camera* inspection of the file. We perceive no abuse of discretion in its decision. *United States v. Ratcliff,* 806 F.2d 1253 (5th Cir.1986), *cert. denied,* — U.S. —, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989).

■ Luffred also complains that the district court refused to order the issuance of subpoenas and payment of costs pursuant to Fed.R.Crim.P. 17[4] to enable her to present several out-of-state witnesses, including an ex-wife and ex-girlfriend of Pe-

ter Luffred, whom she claims would have supported her defense by testifying to his *modus operandi* of seeking out and defrauding vulnerable women. The trial court denied Luffred's motion on the grounds that these prior bad acts were irrelevant to the issues involved in the instant case. We agree with the recent holding of our colleagues of the Eleventh Circuit that evidence of prior bad acts offered by the defense may be relevant under Fed. R.Evid. 404(b) to prove that a co-defendant had the "opportunity and ability to concoct and conduct [a] fraudulent scheme" without the defendant-offerer's aid or participation. *United States v. Cohen,* 888 F.2d 770 (11th Cir.1989). On remand the court should reconsider the issuance of process subject to appropriate conditions and safeguards.[5]

### 2. *Constructive amendment of the indictment.*

■ Luffred next contends that the jury charge as given constituted a constructive amendment of the indictment. Count One of the indictment charged a conspiracy to execute or attempt to execute a scheme to defraud a federally insured institution, a violation of 18 U.S.C. § 1344(1). Count Two charged the defrauding of a federally insured institution and obtaining its money by false pretenses, a violation of section 1344(1) and section 1344(2). Luffred correctly asserts that the court not only failed to point out the distinction between the substantive charges in each count, but also instructed the jury that the substantive charge in Count One was the same as that in Count Two. Mindful of the potential for

---

3. In prior instances we have utilized a procedure of remanding the case to the district court for an evidentiary hearing to determine whether the extrinsic evidence prejudiced the deliberations. *See Howard,* 506 F.2d at 869; *Paz,* 462 F.2d at 746. In those cases, however, extrinsic evidence was *found* in the jury room, necessitating an inquiry into how it came to be there and whether the jurors had even seen it. The fact that the jurors in the instant case specifically *requested* the chart obviates the need for a remand.

4. Fed.R.Crim.P. 17(b) mandates that the court shall order issuance of process on a named

witness upon a showing that the defendant is unable to pay witness fees and that "the presence of the witness is necessary to an adequate defense." If the court orders the subpoena to be issued, then costs and fees associated therewith are to be paid as though the witness has been subpoenaed on the government's behalf.

5. Luffred also contends that the district court should have allowed her to put on expert testimony regarding her vulnerability to being deceived, despite her failure to provide timely notice thereof pursuant to Fed.R.Crim.P. 12.-2(b). We simply note that if retried the time to provide the required notice will run anew.

reversible error, *see United States v. Young*, 730 F.2d 221 (5th Cir.1984), on remand the court must tailor the jury instructions to track accurately the language of the indictment and the statute.

### 3. *Reading of the entire indictment.*

 Prior to trial the district court ruled that only evidence of transactions involving the United Bank loan and the Fondren–Fuqua land-flip would be admitted during the government's case-in-chief. In its charge to the jury, however, the court read the entirety of Count One which included a litany of overt acts about which no evidence had been presented. Luffred contends that the reading of these numerous overt acts had the same prejudicial effect as if they had been introduced into evidence. While it is settled law in this circuit that a court may read an indictment in its entirety provided the jury is instructed that the indictment is not evidence, *United States v. Jones*, 587 F.2d 802 (5th Cir.1979), in the setting of this particular case, fair trial requirements mandate that the court parse the indictment and read to the jury only those overt acts covered by the evidence.

### 4. *Failure to give a specific "good faith" instruction.*

Luffred asserts that the district court erred in denying her request for a specific "good faith" instruction. When the court instructs the jury as to the government's burden of proving that the defendant's conduct was willful and then properly defines that term, it adequately conveys the concept of the good faith defense. *United States v. Gunter*, 876 F.2d 1113 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989). Viewing the court's instruction in light of the entire trial, *Gunter*, 876 F.2d at 1119, we are satisfied that such was the case herein. We merely note that while an elaborate additional instruction may not be necessary, "a defensive theory is best *expressed by the judge.*" *United States v. Fooladi*, 746 F.2d 1027, 1031–32 (5th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985) (emphasis in original).

A balanced instruction frequently requires such.

### 5. *Hypothetical questions on cross-examination of character witnesses.*

 Luffred asserts that the district court erred in permitting the government to impeach her character witnesses by asking hypothetical questions. Specifically, the government asked character witnesses whether they would have the same good opinion of Luffred's honesty if they knew that she had failed to file tax returns in 1983 and 1984, or had otherwise not followed the law. An alleged bad act must have both a basis in fact and be relevant to the character traits at issue before it may be used in cross-examination of a character witness. *United States v. Nixon*, 777 F.2d 958 (5th Cir.1985). Although the government laid a factual basis for its claim that Luffred did not file returns for 1983 and 1984, it laid no basis for its assertion that Luffred had met the income threshold which required that returns be filed. *See* 26 U.S.C. § 6012. While not relevant to the ultimate issue of guilt, the latter showing was necessary to make Luffred's failure to file relevant to the character trait at issue. That particular cross-examination should not have been allowed.

The convictions are REVERSED and the matter is REMANDED.