**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**H.J. "Mickey" SALLEE, Defendant–Appellant.**

**No. 92–1422.**

United States Court of Appeals, Fifth Circuit.

Feb. 16, 1993.

William M. Ravkind, Dallas, TX (court-appointed), for defendant-appellant.

Marvin Collins, U.S. Atty., J. Christopher Belcher, Asst. U.S. Atty., Dallas, TX, Janet K. Jones, Robert E. Lindsay, Alan Hecht-kopf, Joel Tobin, Tax Div., U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

---

1. Judge Alvin B. Rubin was a member of the original panel which heard this case but he died on June 11, 1991. This matter is being handled by a quorum. 28 U.S.C. § 46(d).

2. *Mississippi et al. v. Louisiana et al.,* —— U.S. ——, 113 S.Ct. 549, 121 L.Ed.2d 466 (1992).

Before REAVLEY, KING and WIENER, Circuit Judges.

KING, Circuit Judge:

Following a jury trial, H.J. "Mickey" Sallee was convicted of two counts of wilful failure to report taxable income. *See* 26 U.S.C. § 7201. The district court sentenced Sallee to a five-year term of imprisonment on count one and a consecutive term of five years' probation on count two. On appeal, Sallee challenges the sufficiency of the evidence supporting his conviction of the second count. Finding no reversible error, we affirm.

## I.

This case concerns a real estate transaction known as a "land flip," whereby a single piece of property passes hands more than once and artificially inflates in price during a short time span. As the Government describes in its brief:

A land flip may be illustrated in the following way: at the "front-end" of the flip, A sells land to B for a predetermined contract price. On the "back-end" of the flip, B inflates the price and immediately (sometimes within a matter of minutes) sells the property to C, who has borrowed the purchase price from a financial institution. In a typical land flip, the middle party (*i.e.*, "B") is a straw entity or individual having no "arm's length relationship" with the purchaser or lender. The end purchaser ("C") is generally the only "person ... bringing money to the table" and funds the entire transaction by passing the money needed to complete the original purchase "down the line" through title companies. After the middle party completes the initial purchase and resells the property, he distributes the difference between the two sales prices (*i.e.*, the initial price and the price paid by the end purchaser) "amongst the buyers and the sellers and the bankers and whomever else happened to be involved in the transaction at the time." (citations omitted).[1]

The land flip transaction which is the basis of Sallee's conviction involved thirty-four acres of property known as the Glenn Heights property ("the property"). The property was originally owned by Kessler Park Corporation ("Kessler"), whose sole shareholder was W.H. Williams. The ultimate ("back-end") buyer of this property was a joint venture called Central Park Development (CPD)/Glenn Heights Joint Venture ("the joint venture"). The joint venture was a partnership with three partners—Defendant Sallee, Lynn Felps, and Ron Finley.

In July and August of 1985, Williams proposed a four-party land flip transaction whereby Kessler, as the original "front-end" seller, was to convey the property to Finley's corporation, Central Park Development Corp. (CPD)—an entity distinct from the joint venture—for $1.60 per square foot, totalling over $2 million.[2] As a trust-

---

1. The Government describes only one species of a land flip. A phenomenon that was especially noticeable during the early stages of the banking crisis in the 1980s, land flips have been used for a variety of fraudulent purposes: for example, to dupe a lending institution and enable the "back-end" seller to borrow more money than a lender would otherwise be willing to allow on a mortgage (thereby leaving the bank with insufficient collateral) or to dupe the "back-end" buyer into believing the property is worth more than it actually is. *See United States v. Luffred*, 911 F.2d 1011, 1013 (5th Cir.1990); M. Monse, Ethical Issues in Representing Thrifts, 40 BUFF. L.REV. 1 at n. 40 (1992); Note, Are the Accountants Accountable? Auditor Liability and the S & L Crisis, 25 IND.L.REV. 475 at n. 37 (1991). Land flip transactions apparently are not *per se* illegal. In *Luffred, supra,* this court noted that "[t]he government produced no evidence that the land-flip transaction was illegal; at oral argument it candidly conceded that it was not inherently illegal." *Id.* at 1013 n. 1. Rather, land flip schemes are frequently vehicles for other types of fraud or illegality.

2. At one point in his brief, Sallee states that $1.60 per square foot multiplied times the total square footage (which he fails to note) totalled approximately $2.5 million (p. 3). At another point in his brief, he states that the total square footage (again undisclosed) multiplied by $1.60 per square foot totalled approximately $2.1 million (p. 6). At a third point in his brief, Sallee claims that the total amount was $2.2 million

ee for CPD, Kessler in turn was to sell the land to the Tristar Capital Corporation, an entity controlled by Thomas Sullivan, for $4.9 million. Finally, Tristar was to sell the property to the joint venture for $6.14 million.[3] The contemplated transaction came quite close to being consummated; however, it is undisputed that this proposed land flip was never closed because of an inability to obtain the necessary financing.[4]

After this proposal failed, it was agreed that a three-party land flip would work as follows: Kessler[5] would sell the property to Universal Savings Association for $4.9 million; Universal, in turn, would sell the property to the joint venture for $6.14 million. Tristar was to serve as the broker on the deal, receiving a 10% commission, which was well above the going rate for brokers.[6] In late 1985, this transaction was actually consummated.[7]

In addition to serving as the "front-end" buyer and the "back-end" seller, Universal Savings also acted as the *lender* of 80% of the $6.14 million paid for the property by the joint venture, or $4.9 million (which was also the amount Universal paid for the property at the "front-end" of the deal). Following the consummation of the "front-end" of the land flip, Williams—on behalf of Kessler—instructed the title company that handled the closing to distribute the $4.9 million as follows: $1.9 million went to Kessler; $300,000 went to a roofing company owned by Williams' brother;[8] and $2.4 million was paid directly to the joint venture. Thereafter, when the "back-end" of the land flip was consummated, the joint venture paid Universal a "20% cash downpayment" for the property, or $1.2 million. The $1.2 million came out of the $2.4 million that was distributed to the joint venture by Kessler, which itself was derived from the $4.9 million in sales proceeds paid by Universal in the first place. The joint venture also signed a promissory note for

(p. 7). This is inexplicable, particularly because Sallee cites the same portion of record to support two of the different dollar amounts. Our examination of those record cites reveals no mention of the precise amount of square footage, so there is no way to determine which amount is correct.

3. At the time the various proposed documents purporting to memorialize this contemplated land flip were drafted, the joint venture was not yet in existence. As the joint venture agreement and the venture's unincorporated business certificate indicate, the joint venture did not come into legal existence until September 3, 1985.

4. There were three Contracts for Sale, two of which were executed by both buyer and seller and one of which was executed only by the seller. The two fully executed contracts, however, contained conditions precedent whereby the contracts became ineffective unless financing was obtained by August 30, 1985. It is undisputed that such financing was never obtained. As Sallee states in his brief, "*If* Sullivan, or Tristar, had been able to obtain a $4,912,000 loan, there *would have been a simultaneous closing....*" (emphasis added). Understandably, there were never any corresponding warranty deeds executed.

Throughout this case, Sallee has made much ado about the July 1, 1985 proposed Contract of Sale between Kessler and Finley's CPD Corporation. He ignores that the proposed contract, *by its own terms,* was nothing more than an unaccepted offer. Paragraph 12, "Contract as Offer," states that "[t]he execution of this Contract by the first party [Kessler] ... constitutes an offer to ... sell the Property. Unless within FIVE (5) days from the date of execution of this Contract by the first party[ ] this Contract is accepted by the other party and a fully executed copy is delivered to the first party, the offer of this Contract shall be automatically revoked and terminated...." Although Williams signed the proposed contract, dated on July 1, 1985, no agent for the CPD Corporation ever signed the document.

5. The "front-end" Contract of Sale lists Kessler as "trustee," although it does not disclose the purported party for whom Kessler was acting as trustee. The purchaser's statement and the warranty deed, conversely, list Kessler and W.H. Williams as the "seller," with no mention of any trustee capacity.

6. Part of this brokerage fee was kicked-back to the joint venture; however, that kickback is not part of this case.

7. The documentation of this transaction includes title company documents, executed warranty deeds, and purchaser's and seller's statements—all reflecting that *two* separate conveyances of the property occurred, one between Kessler and Universal, and the second between Universal and the joint venture. The joint venture agreement also explicitly outlined the proposed three-party land flip in this manner.

8. Williams was indicted for tax evasion in connection with this $300,000; he pled guilty.

the balance of the loan from Universal in the amount of $4.9 million.[9]

The remainder of the $2.4 million given to the joint venture—$1.2 million—was then distributed to the joint venture's three partners, Defendant Sallee, Felps, and Finley.[10] Sallee's share was $333,333, which he deposited in his personal bank account. On its 1985 partnership "information return" filed with the IRS,[11] the joint venture reported that the $333,333 distributed to Sallee was from the partnership's capital account; returns of capital are not taxable income.[12] Many months later, when Sallee's accountant, Terrence Malloy, prepared Sallee's 1985 tax return, he asked Sallee about the $333,333. Sallee responded that the money was from an "overfunding" of a real estate loan, which was non-taxable,[13] and further that the transaction had occurred in 1986, which would render it irrelevant for purposes of a 1985 tax return.[14] Sallee showed his accountant no documentation, so the accountant took Sallee at his word. Thus, Sallee's 1985 tax return did not reflect the $333,333. Had it done so, the Government claims, Sallee would have been liable for over $50,000 in taxes, which was never paid.

At the close of the Government's evidence at trial, Sallee argued that a key element of the crime of tax evasion was not proved by the Government: namely, that in order to establish a tax deficiency, the income not reported must have been "taxable." Sallee argued that the $333,333 was simply a "loan" surplus and, as such, it was non-taxable. Sallee contended that the

"economic reality" of the transaction was as follows: the joint venture was the actual original "front-end" buyer of the property for some amount above $2 million, based on the July 1, 1985 land sale contract between Finley's CPD Corporation and Kessler;[15] the joint venture then supposedly sold the property to Universal for $4.9 million in an intermediate transaction where Kessler served as the trustee for the joint venture; the joint venture then supposedly bought the property back from Universal for $6.14 million. Sallee claims that the $4.9 million paid by Universal to Kessler covered the $2 million-plus "front-end" purchase, with either $2.4 or $2.8 million in loan "surplus" going to the joint venture.[16] The district court denied Sallee's motion for judgment of acquittal based on Sallee's version of the evidence, and the jury found Sallee guilty of failing to report $333,333 of taxable income in his 1985 tax return.

## II.

On appeal, Sallee argues that the Government's evidence was insufficient to establish the elements of the crime of tax evasion, an offense proscribed by 26 U.S.C. § 7201. The three elements of that offense are: i) the existence of a tax deficiency; ii) an affirmative act constituting an evasion or attempted evasion of the tax; and iii) wilfulness. *See Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). Only two of the three elements are in dispute: the existence of a tax deficiency and wilfulness.[17]

9. The joint venture defaulted on this loan.

10. Felps refused to accept his distribution and accordingly returned the check to the joint venture.

11. Unlike corporations, partnerships generally do not pay taxes; taxable income "passes through" to the partners, who are individually assessed taxes. A partnership nevertheless must file an "information return" accounting for its finances for the previous tax year.

12. *See, e.g., District of Columbia v. Goldman*, 328 F.2d 520 (D.C.Cir.1963).

13. It is well-established that bona fide loans do not constitute "income" for tax purposes. *See,*

*e.g., United States v. Ivey*, 414 F.2d 199 (5th Cir.1969).

14. The transaction was consummated in 1985.

15. See *supra* note 4.

16. Once again, Sallee's brief cites two different figures. On page 7, he claims that there was a $2.4 million surplus; on page 8 n. 7, he claims that the loan surplus was $2.8 million. The Government's brief cites the $2.4 million figure, which it claims was a taxable kickback rather than a non-taxable loan surplus.

17. It is uncontroverted that Sallee failed to report the $333,333 on any tax return.

## A. Existence of a tax deficiency

█ The Government characterizes the $333,333 as a classic kickback rather than a loan. Sallee does not dispute that a kickback qualifies as taxable income;[18] instead, he argues that in both form and in "economic substance" the $333,333 at issue in this case was non-taxable surplus from a loan rather than a kickback. The Government counters that the form of a transaction is determinative in determining an individual's tax liability; and, according to the formal structure of land flip, the Government argues, Sallee received a kickback rather than a loan.[19]

The only issue for this court on appeal is whether there was sufficient evidence at trial for a rational jury to find, beyond a reasonable doubt, the existence of a tax deficiency. We must examine the evidence in a light most favorable to the Government and determine whether a rational jury could find beyond a reasonable doubt that Sallee received a taxable kickback rather than a non-taxable loan.[20] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We will not hold that Sallee's jury convicted him based on constitutionally insufficient evidence simply because, according to Sallee's version of the evidence, there was a loan rather than a kickback. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence ..., provided that a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt."), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Although a rational jury could have accepted Sallee's version of the land flip,[21] we

---

18. *See, e.g., Braggs v. Commissioner*, 856 F.2d 163 (11th Cir.1988).

19. The Government cites a number of civil tax cases, which stand for the general proposition that the IRS may assess taxation based on the form in which parties structure a transaction. *See, e.g., Commissioner v. National Alfalpha Dehydrating & Milling Co.*, 417 U.S. 134, 148–49, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974) ("This Court has observed repeatedly that, while a taxpayer is free to organize his own affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice...."); *Spector v. Commissioner*, 641 F.2d 376, 381 (5th Cir.1981) ("[A]s a general rule, [the IRS] may bind a taxpayer in the form in which the taxpayer has cast the transaction.").

20. Sallee's jury was instructed that it could not convict Sallee of tax evasion unless it found beyond a reasonable doubt that the $333,333 was a kickback rather than a loan.

21. *Sallee's Version of the Land Flip*
    **Step one:** Kessler, the original owner of the property, sells it to the joint venture for $1.60 per square foot, or approximately $2.5 million; no sales proceeds are given and no promissory note is executed
    **Step two:** The joint venture, with Kessler serving as a trustee, "sells" the property to Universal for $4.9 million; however, the transaction is in reality only a loan from Universal to the joint venture to be completed later (see step four)
    **Step three:** Kessler, as trustee, keeps the $2.5 million owed to it by the joint venture (see step one); the remaining $2.4 million is given to the joint venture, and Sallee receives $333,333
    **Step four:** Universal "sells" the property back to the joint venture for $6.14 million; the joint venture pays $1.2 million of the "purchase price" in cash (which comes out of the $2.4 million loan excess, see step three) and executes a promissory note for the $4.9 million balance; in reality, there is no $6.14 million "sale" and the $4.9 million promissory note is for the "front-end" loan (see step two)
    This version of the land flip is based on documentation that was drawn up during the original attempt to structure the land flip in the summer of 1985, when it was contemplated that different parties would participate. That documentation supposedly proves that the money that the joint venture received from Kessler was intended to be surplus from a loan from Universal to the joint venture. In particular, Sallee argues that this court should consider the July 1, 1985 proposed land sale contract, whereby Finley's Central Park Development (CPD) Corporation—a company distinct from the joint venture—was to purchase the Glenn Heights property at the "front-end" of the land flip from Kessler for $1.60 per square foot, or approximately $2.5 million. Sallee claims that this is actually what occurred, although it "was concealed from the title company" during the successful land flip.
    We note that a rational jury could have concluded that the July 1, 1985 proposed land sale contract between Finley's CPD Corporation and Kessler, by its own terms, never became effective. Further, as the Government points out, the CPD Corporation and the joint venture were

will not reverse Sallee's conviction so long as a rational jury could also have accepted the Government's version. And because we believe that the Government's version of the land flip finds ample support in the record,[22] we hold that a rational jury could find beyond a reasonable doubt that the Government's version is in fact what occurred.

Sallee also argues that, irrespective of the form of the land flip, we should look at the "economic substance" of the transaction. Sallee specifically argues that the $4.9 million loan from Universal to the joint venture was "really" for the purpose of financing the joint venture's alleged "front-end" purchase of the property for $2.5 million and that the $2.4 million remainder—from which Sallee's $333,333 cut came—was simply non-taxable loan "surplus." Because our review is circumscribed by *Jackson v. Virginia, supra,* Sallee is in effect asking us to declare that there is *no* substantial evidence in the record that would support a rational jury's finding that there was a kickback rather than a loan. We cannot say that, as a matter of tax law, a rational jury would be foreclosed from finding that a kickback occurred. That is, we reiterate, the evidence would not prevent a rational jury from accepting the Government's version of the land flip. In particular, the formal documentation of the land flip fully supports the Government's version.[23] Moreover, one may reasonably ask, why would the parties have formally structured such an elaborate multi-step transaction if all that was intended was a simple overfunded real estate loan from Universal to the joint venture?

Finally, a jury could have rationally concluded that Sallee knew that he and the joint venture would ultimately default on the $4.9 million loan from Universal, as they in fact did.[24] The Government offered Sallee's jurors ample evidence that Sallee was in need of quick cash during the time that the land flip occurred. A jury could reasonably infer that neither Sallee nor the joint venture ever intended to repay the loan. In such a case, the "loan" would not have been bona fide and Sallee's receipt of a cash infusion would have been taxable.

**B. Wilfulness**

■ This question is simply an extension of the issue of whether there was a loan or a kickback—that is, whether Sallee *intended* to receive a kickback as opposed to a loan. Sallee argues two points here. First, he contends that he could not have known that the transaction was intended as a kickback because he had no involvement with the structuring of the particular land flip that in fact occurred; he claims he was ignorant of the form chosen and mistakenly believed that it was a loan rather than a kickback. Second, Sallee argues that because his CPA, Malloy, opined in his expert testimony at trial that the $333,333 that Sallee received was non-taxable, Sallee could not have intended to avoid paying taxes.

The Government counters that even though Sallee may not have played a role in structuring the land flip, Sallee signed (and thus presumably read) all the various documents executed by the joint venture—including a purchaser's statement and a promissory note delivered to Universal. As the Government correctly points out,

---

not one and the same. Even if there was some agreement between Kessler and the CPD Corporation, a rational jury could find that the contract would not have inured to the benefit of the joint venture.

**22.** *The Government's Version of the Land Flip*
**Step one:** Kessler, the original owner of the property, sells it to Universal for $4.9 million; Universal pays the amount in full
**Step two:** Williams, Kessler's sole shareholder, keeps approximately $2 million of the sales proceeds, funnels $300,000 to his brother's roofing company, and gives approximately $2.4 million to the joint venture

**Step three:** Universal sells the property to the joint venture for $6.14 million; the joint venture executes a $4.9 million promissory note and pays a $1.2 million "cash down-payment" out of the $2.4 million given to the venture by Williams

**23.** This was also the district court's opinion of the evidence in denying Sallee's motion for a judgment of acquittal.

**24.** We observe that not only did such a default occur, but also that Universal became insolvent after the loan was made.

there was no mention anywhere in this documentation of a loan "surplus," the amount of the money given to the joint venture by Kessler. There is no evidence, except Sallee's bare allegation, that he was unaware of the true nature of the transaction.[25] As for Sallee's argument regarding his accountant, the Government again correctly notes that Malloy became Sallee's accountant only *after* the land flip was consummated and, at the time Malloy prepared Sallee's 1985 tax return, was never informed by Sallee of the actual details of the transaction. Malloy's trial testimony— which is only a single accountant's opinion and which certainly appears incorrect as a matter of tax law—was *post hoc;* it was not a professional opinion that Sallee relied upon in failing at the time to report the $333,333 in his 1985 tax return.

In sum, particularly in view of the deferential sufficiency standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), a rational jury could easily infer that Sallee knew that he was receiving a kickback rather than loan proceeds.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

Before REAVLEY, KING and WIENER, Circuit Judges.

---

25. We note that Sallee, a former officer of a financial institution, was also convicted at trial for tax evasion with respect to a second land flip. He chose not to appeal that conviction. It is not as if Sallee can claim that he was an unwitting, unsophisticated pawn in a scheme carried on by other persons.