IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2744

_____

ROBERT NELSON DREW,

Petitioner-Appellant,

v.

JAMES A. COLLINS, Director, Texas Department,
of Corrections, Institutional Division

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(June 18, 1992)

Before KING, JOLLY, and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

Robert Nelson Drew appeals the district court's denial of
his petition for a writ of habeas corpus on several grounds.
Finding no error, we affirm the district court's denial of the
writ.

I.    BACKGROUND

The recitation of facts is taken in large part from the
opinion of the Texas Court of Criminal Appeals.  Drew v. State,
743 S.W.2d 207 (Tex. Crim. App. 1987).

In February 1983, seventeen-year-old Jeffrey Leon Mays, who
was not getting along with his parents, decided to run away from

home.  He decided to leave his home in Praco, Alabama with his high school friend, Bee Landrum.  Both young men had experienced family conflict because of their difficulties with alcohol and drugs.  They left Alabama in Landrum's car with eight dollars, some food, and Landrum's buck knife.

Mays and Landrum picked up a number of hitchhikers to obtain gas money.  At the suggestion of one, John Sly, they spent the night at the Salvation Army in Lafayette, Louisiana.  There they met Drew, who was in the company of a man named Frank.  Mays and Landrum agreed to give Drew and Frank a ride to Franklin, Louisiana, thirty miles east of Lafayette, in exchange for money and gas.  When they arrived in Franklin, Frank bought pizza and beer for everyone, filled Landrum's car with gas, and gave Drew sixty-five dollars.  Mays and Landrum agreed to take Drew to Houston in exchange for more gas money.  Mays, Landrum, and Drew left Frank in Franklin and traveled back west toward Lafayette.

While passing through Lafayette, they saw John Sly hitchhiking and picked him up again.  Shortly after leaving Lafayette, the group picked up another hitchhiker, Ernest Puralewski.  Everyone was drinking beer except Mays, who was driving.  At least one marijuana cigarette was passed around, which everyone smoked except Mays.  Drew and Puralewski engaged in conversation.  Puralewski stated that he was on the run and that he had been in prison with Charles Manson in California.

Mays, apparently unnerved by this conversation, told the group he wanted to stop and make a telephone call to his parents.

2

After appearing to make the call, he returned to the car and stated that his father was gravely ill and that he had to return to Alabama.  Drew was upset that Mays was not going to take him to Houston as planned.  He believed that Mays had lied about his father in an attempt to abandon the hitchhikers.  He punched Mays in the face and held a knife to Landrum's throat.  Drew threatened Landrum and Sly that he ought to cut their throats.  Drew then wrapped his arm around Mays' neck and, holding a knife to his neck, ordered him to stop the car.

Puralewski, armed with the buck knife he had borrowed from Landrum earlier, pulled Sly out of the car and robbed him.  Drew prevented Landrum from leaving the car, telling him "if you try anything you are dead."  Drew ordered Landrum to the front seat and moved Mays to the back seat.  He began to punch Mays in the face while calling him a punk, accusing him of lying about the telephone call to his parents, and threatening Mays that he was going to die.  Mays did not resist this attack.

According to Landrum, Puralewski told Drew to take Mays' watch and wallet if he planned to kill him, so that Mays would not have any identification.  Drew took these items.  Mays muttered something to the effect that Drew "would not get away with this."  Both Drew and Puralewski decided to kill Mays.  They ordered Landrum to pull the car to the side of an access road on I-10, where they pulled Mays out of the right side of the car. Watching through the rear-view mirror, Landrum saw Drew pull Mays' head back and make a slashing motion across his throat.

3

Puralewski stabbed Mays at the same time. The two men rolled Mays' body into a ditch and ordered Landrum to continue the drive to Houston. After leaving Puralewski at a bar in Houston, Drew and Landrum were stopped by the police at 3:30 A.M. for speeding. After an investigation, Drew was charged with capital murder.

On December 3, 1983, Drew was convicted of capital murder and received a death sentence. On March 7, 1984, Puralewski pleaded guilty to one count of capital murder and was sentenced to a sixty-year term of imprisonment. On March 24, 1984, Drew moved for a new trial based on newly discovered evidence. This motion was based in part on an affidavit prepared by Puralewski, who declared that he acted alone in killing Mays. The state trial court denied this motion on April 13, 1984.

On May 9, 1984, Drew moved the Texas Court of Criminal Appeals for leave to file for a writ of mandamus or for abatement and requested a hearing. The Court of Criminal Appeals denied this motion on May 14, 1984. On September 30, 1987, the Court of Criminal Appeals affirmed Drew's conviction and sentence. Drew v. State, 743 S.W.2d 207 (Tex. Crim. App. 1987).

Drew filed a state habeas petition on April 28, 1988. The state trial court recommended denial of the writ. The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law and denied the writ. Ex parte Drew, No. 13,998-02 (Tex. Crim. App. June 14, 1988). On the same day the Court of Criminal Appeals denied his petition, Drew filed a

4

motion for stay of execution and a habeas petition in federal district court.

The district court granted Drew a stay of execution on June 14, 1988. It denied Drew habeas relief on February 20, 1991. Drew appealed this decision and requested the issuance of a Certificate of Probable Cause (CPC). The district court granted CPC on July 31, 1991.

## II. DISCUSSION

Drew argues that he should receive habeas relief because (1) the jury's consideration of the possibility of parole violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the Constitution; (2) the wrongful dismissal of two prospective jurors violated his Sixth and Fourteenth Amendment rights; (3) prosecutorial misconduct during trial violated his Fourteenth Amendment rights; (4) the application of the Texas capital sentencing statute in his case unconstitutionally prevented the jury from giving full mitigating effect to the evidence of his troubled childhood, his drinking problem, and the fact that he had consumed drugs and alcohol at the time of the crime; (5) Texas' thirty-day limit for new trial motions precluded the consideration of newly discovered evidence showing Drew's innocence in violation of his Eighth and Fourteenth Amendment rights; and (6) he received ineffective assistance of counsel. We address each of these claims separately below.

A. Jury's Consideration of the Possibility of Parole

During the jury's deliberations at the punishment phase of trial, Drew contends, jurors speculated that a life sentence would probably result in parole for Drew and agreed that Drew should never be paroled.  Drew submitted an affidavit to the state habeas court in support of this claim.  The affidavit, executed by Peter Fleury, a private investigator assisting Drew's attorney, related the content of a telephone conversation Fleury had with Alvin Eisenberg, the foreman of the jury.  Fleury averred that Eisenberg told him that the jury felt that Drew should never be paroled and agreed that they did not want Drew "roaming our streets."

Drew argues that his sentence violated his Sixth, Eighth, and Fourteenth Amendment rights because jurors discussed whether Drew would be eligible for parole should they sentence him to life imprisonment.  Drew asserts that had the jurors not made this impermissible consideration, they would have returned a sentence of life imprisonment rather than death.

We directly considered whether a Texas jury improperly considered parole law during capital sentencing deliberations in De La Rosa v. Texas, 743 F.2d 299 (5th Cir. 1984), cert. denied, 470 U.S. 1065 (1985).  We indicated that while the mention of parole law amounts to misconduct, "[o]nly jury misconduct that deprives the defendant of a fair and impartial trial warrants granting of a new trial."  Id. at 306, cited in Monroe v. Collins, 951 F.2d 49, 52 (5th Cir. 1992).  In Monroe, we relied on California v. Ramos, 463 U.S. 992 (1983), to hold that,

6

> [b]ecause it is not repugnant to the federal constitution for a state to accurately instruct the jury on parole procedures, it follows that a state trial juror's accurate comments about parole law do not offend the federal constitutional rights of the defendant.

Id. at 53.  Furthermore,

> we have distinguished between jury panels tainted by outside influence, such as publicity or direct appeals from third parties, and panels on which one or more of the jurors themselves have violated an instruction of the court.  In the former case, "a presumption of prejudice arises when the outside influence is brought to the attention of the trial court, and it is incumbent upon the Government to rebut that presumption at a hearing."

United States v. Webster, 750 F.2d 307, 338 (5th Cir. 1984) (citations omitted) (quoting United States v. Chiantese, 582 F.2d 974, 978 (5th Cir. 1978), cert. denied, 441 U.S. 922 (1979)), cert. denied, 471 U.S. 1106 (1985).  In the latter case, however, no such presumption arises, and the defendant must demonstrate that jury misconduct prejudiced his constitutional right to a fair trial.[1]  See id. at 338-39.  Since Drew does not allege any outside influence on the jury, he cannot avail himself of the presumption of prejudice.

---

[1] Drew's contention falls into this category.  For this reason, United States v. Luffred, 911 F.2d 1011 (5th Cir. 1990), which Drew urges us to apply, is inapposite.  In Luffred, we addressed the jury's consideration of a chart used by the Government as a trial aid during its closing argument but excluded from evidence by the district court.  Under those circumstances, we held that a presumption of prejudice arose. Id. at 1014.

In response to Fleury's affidavit, the State furnished the state habeas court with an affidavit executed personally by Eisenberg.  In his affidavit, Eisenberg stated that "[t]he fact that Drew might or might not one day receive parole if he received a life sentence did not influence our answers."  Based on this evidence and the record, the state habeas court found that "[a]lthough the jury was generally aware that a life sentence might result in eventual parole for [Drew], the jury's answers to the special issues were based solely on the evidence and the jury's belief that there was, beyond a reasonable doubt, a probability that [Drew] would commit criminal acts of violence that would constitute a continuing threat to society."  Ex parte Drew, No. 13,998-02, at 411.  The court also found that "[t]he evidence presented does not demonstrate that there was a misstatement of law, asserted as a fact by one professing to know the law that was relied upon by other jurors who, for that reason, changed their vote to a harsher punishment for [Drew]."  Id.[2]  Because the record fairly supports these findings, we accord them a presumption of correctness pursuant to 28 U.S.C. § 2254(d).  See Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Loyd v. Smith, 899 F.2d 1416, 1425 (5th Cir. 1990).  Drew does

---

[2] This finding tracks the five-part test employed by Texas courts to determine whether a jury's discussion of parole law requires reversal.  See Monroe v. Collins, 951 F.2d 49, 52 n.7 (citing Sneed v. State, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984)) (defendant must show "(1) a misstatement of law, (2) asserted as a fact, (3) by one professing to know the law, (4) which is relied upon by other jurors, (5) who for that reason changed their vote to a harsher punishment").

not present evidence to support his allegation of jury prejudice. As such, he fails to show a constitutional violation on this ground.

B.  Wrongful Dismissal of Prospective Jurors

Drew asserts that the trial court improperly excused for cause prospective jurors Grover Smith and Archie Cotton.  This error, he contends, violated his Sixth and Fourteenth Amendment rights as recognized in Wainwright v. Witt, 469 U.S. 412 (1985).

In a capital case, a prospective juror may not be excluded for cause unless the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath."  Adams v. Texas, 448 U.S. 38 (1980); accord Witt, 469 U.S. at 424.  Witt also explained that the presumption of correctness conditionally required under § 2254(d) applies to the trial court's determination of a challenge for bias.  469 U.S. at 430.  "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Id. at 428 (footnote omitted).  The trial court need not detail its reasoning or explicitly conclude that a prospective juror is biased, so long as it is evident from the record.  Id. at 430.

A review of Grover Smith's voir dire examination reveals that he stated on several occasions that he would hold the State to a higher burden of proof than the "reasonable doubt" standard in a capital case.  Drew portrays Smith's statements as indicating not that he would hold the state to a higher burden of

9

proof, but that Smith would permit the capital nature of the case to influence his perception of what constitutes proof beyond a reasonable doubt.  Drew contends that <u>Adams</u> prohibits dismissal of a prospective juror on this ground.   In <u>Adams</u>, the Court held that the Constitution did not permit exclusion of jurors

> from the penalty phase of a Texas murder
> trial if they aver that they will honestly
> find the facts and answer the questions in
> the affirmative if they are convinced beyond
> reasonable doubt, but not otherwise, yet who
> frankly concede that the prospects of the
> death penalty may affect what their honest
> judgment of the facts will be or what they
> may deem to be a reasonable doubt.  Such
> assessments and judgments by jurors are
> inherent in the jury system, and to exclude
> all jurors who would be in the slightest way
> affected by the prospect of the death penalty
> or by their views about such a penalty would
> be to deprive the defendant of the impartial
> jury to which he or she is entitled under the
> law.

448 U.S. at 50.  Here, however, prospective juror Smith did not merely state that he might apply the reasonable doubt standard differently in a capital case.  He stated on numerous occasions during voir dire questioning that he would apply a standard higher than what he understood as the reasonable doubt standard. The trial court could correctly determine that Smith's insistence on such a high burden of proof would substantially impair his performance as a juror.

Archie Cotton's definition of "continuing threat to society" under the second special issue[3] prompted the trial court to

---

[3]  Tex. Code Crim. Proc. art. 37.071(b)(2) asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a

10

dismiss him for cause.  Cotton explained that he understood this question as requiring the State to prove the probability that the defendant would commit future murders.  He indicated that he would answer the question affirmatively only if the evidence convinced him that the defendant was likely to murder again.  Based on Smith's responses, the trial court could correctly conclude that this restrictive definition of "future acts of violence" would prevent or substantially impair the performance of Cotton's duties as a juror by requiring a more stringent burden of proof than the law requires.  Because the record supports the conclusions of the trial court concerning prospective jurors Smith and Cotton, we presume that it is correct.  Drew's arguments fail to overcome this presumption.  Accordingly, we conclude that this claim lacks merit.

C. <u>Prosecutorial Misconduct</u>

    1. <u>Improper argument</u>

Drew argues that the prosecution engaged in persistent and repeated acts of misconduct, depriving him of the right to a fair trial under the Fourteenth Amendment.  Drew specifically objects to the prosecution's (1) appeal for swift return of the verdict to avoid insulting the victim's family; (2) what Drew characterizes as its misstatement of the law of capital murder as allowing conviction if the jury finds an ongoing robbery, including robbery of an individual other than the victim; (3) improper reference to the trial judge; (4) bolstering and

_____

continuing threat to society."

personally vouching for witnesses; and (5) inflammatory language referring to Drew. In addressing this claim, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)); accord Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir.), cert. denied, 484 U.S. 933 (1987). The district court concluded that the prosecutor's actions "did not rise to the dimension of constitutional error necessary to sustain Drew's petition for writ of habeas corpus."

After reviewing the argument in the context of the trial as a whole, we agree with the district court's assessment. First, although the prosecutor's request for a swift verdict on behalf of the victim's family was improper, it was brief.[4] In view of the strength of the evidence pointing toward Drew's guilt, we conclude that this remark did not leave an unconstitutional taint

---

[4] The prosecutor argued:

> The only question is was a robbery going on and was the defendant the one who did it. That doesn't take long. To take a long time is unfair. It's an insult to what this has been about. It is an insult to people here--to the victim's family and to Bee.

The trial court overruled defense counsel's objection to this comment. In closing, the prosecutor concluded:

> I am going to sit down and ask that you come to a swift verdict and the only verdict that is applicable under the law that of [sic] this defendant being guilty of capital murder.

12

on the proceeding.  See United States v. Ellender, 947 F.2d 748, 758 (5th Cir. 1991) (analysis of whether a prosecutor's argument deprived a defendant of a fair trial involves consideration of (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt); see also United States v. De La Rosa, 911 F.2d 985, 991 (5th Cir. 1991) (same test employed in plain error analysis), cert. denied, 111 S. Ct. 2275 (1991).

Second, we disagree with Drew that the record clearly reflects that the prosecutor misstated the law of capital murder in Drew's case.  In context, the prosecutor's statements can be read to remind the jury of its ability to draw reasonable inferences from the evidence.[5]  The record does not show that the prosecutor argued that the jury could convict Drew for capital murder if it found that he robbed someone other than the victim. We do not find that this portion of the prosecutor's argument resulted in a denial of Drew's right to due process.  See Boyde v. California, 110 S. Ct. 1190, 1200 (1990).

Third, Drew contends that the prosecutor improperly argued that the trial judge was telling the jury that it had to find Drew guilty of capital murder.[6]  The thrust of the prosecutor's

_____

[5] The thrust of the prosecutor's argument was that the evidence showed that there was an ongoing robbery.  Based on this showing, the prosecutor argued, the jury could infer that Drew killed Mays in the course of committing a robbery.

[6] At one point, the prosecutor stated:

13

argument was that the definitions contained in the charge required the jury to find Drew guilty. We "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974), quoted in Boyde, 110 S. Ct. at 1200. We therefore hold that this remark did not violate Drew's due process rights.

Fourth, Drew argues that the prosecutor improperly vouched for the credibility of Landrum and Sly. The prosecutor told the jury that he had not told Landrum or any other witness what to say, stated that he thought "Landrum was trying to do what was right," and declared that Sly was credible because Mays' killing "shocks his conscience, too." The Court of Criminal Appeals rejected Drew's argument on direct appeal, finding that the argument in rehabilitation of these witnesses, in response to the

---

> I ask you to look at the facts and realize that based upon those facts that there is no other conclusion than that there was a robbery going on, an all day robbery. You had a rolling chamber of torture, a chamber of execution in that car. That's what that rolling party became that this defendant--guilty, guilty, more guilty than Mike [Puralewski] of this offense. And I think you can see that the only way to come to this conclusion safely is by looking at the charge. The Judge needs you to do that. Realize that most of its definitions you have heard before and the Judge is telling you that you have to find him guilty.

At another point, the prosecutor argued to the jury:

> Keep in mind what that evidence is and keep in mind the Court is not telling you what to do. The Court cannot do that."

14

defense's attack during its closing argument, was a reasonable deduction from the evidence. Drew v. State, 743 S.W.2d at 218.

Prosecutors "may not assert [their] own credibility as a foundation for that of [their] witnesses." United States v. Garza, 608 F.2d 659, 664 (5th Cir. 1985). Here, while the phrasing may have been improper, the prosecutor's comments did not bolster the credibility of the witnesses based solely on the prosecutor's own credibility. The prosecutor's comments were grounded in evidence presented to the jury and did not infect the trial with unfairness so as to violate Drew's due process rights.

Finally, Drew argues that the prosecutor engaged in verbal abuse and inflammatory rhetoric, referring to Drew as a "sadistic killer," a "macho man," and referring to the trip from Louisiana to Texas as a "rolling torture chamber" and a "chamber of execution." Although we agree that the prosecutor used inflammatory language, his comments referred to specific evidence in the record. In this context, we do not find that these arguable errors resulted in a violation of Drew's due process rights.

    2.  Brady claim

Drew also argues that the prosecution's failure to reveal the existence of a taped police interview with Bee Landrum, in which Landrum stated he did not see the murder, amounted to a violation of his due process rights. He asserts that the oral statement would have provided significantly more effective impeachment evidence against Landrum than the written statement

15

provided, which was prepared based on an interview conducted approximately six hours later.[7]

The state habeas court found that Landrum's recorded statement was generally consistent with his later written statement, and that "defense counsel was able to effectively cross-examine Bee Landrum concerning his observations of the stabbing utilizing Landrum's written statement." The district court also concluded that the prosecutor's inadvertent failure to provide Drew's counsel with the recorded statement did not amount to a Brady violation.

Brady v. Maryland, 373 U.S. 83 (1963), requires that the prosecutor produce evidence that is useful for impeachment, as well as exculpatory material. United States v. Bagley, 473 U.S. 667, 676 (1985). To prevail on a Brady claim, a defendant must show (1) the prosecution suppressed evidence that was (2) favorable to the accused and (3) material to either guilt or punishment. Cordova v. Collins, 953 F.2d 167, 171 (5th Cir. 1992). The prosecutor's failure to respond fully to a specific

---

[7] Drew refers to the following exchange in the taped interview:

[Landrum] I don't know. OK, so we pulled over and they took the keys out of the car. Lock my door and says if I move I am a dead man. They take Jeff outside and hear them hit him a few times and then I hear him cutting him. You know, stabbing him.

[Interviewer] Did you look over and see them stabbing him?

[Landrum] I'd seen them throwing him on the ground and I seen them bending over and then when I heard the sounds I shut my eyes and turned away.

16

request for evidence favorable to the accused amounts to a constitutional violation "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

We agree with the district court that Drew does not establish a Brady claim. Drew argues that had he been given the recorded statement, the prosecutor could not have rehabilitated Landrum by arguing that Landrum was more fatigued when he prepared the written statement, or that the typist transcribing Landrum's statement could have written it down inaccurately. We defer to the state court finding that these statements were generally consistent with each other. While the prosecutor failed to provide Drew with Landrum's recorded statement, any incremental impeachment value Drew would receive from the minor inconsistencies between the statements does not raise a reasonable probability that, had the statement been disclosed to Drew's counsel, the outcome of the proceeding would have been different. Drew therefore cannot prevail on this claim.

D.   Penry Claim

Drew asserts that the Texas sentencing statute precluded the jury from fully considering and giving effect to relevant mitigating evidence. As a result, he contends, his sentence violates the Sixth, Eighth, and Fourteenth Amendments as recognized in Penry v. Lynaugh, 492 U.S. 302 (1989). Drew's uncle, Donald Martelle, testified during the punishment phase of

17

trial that Drew had a troubled childhood and a severe drinking problem. Other evidence in the record included Drew's comparative youth at the time the crime was committed, the fact that he did not strike the blow that killed May, and the fact that Drew had consumed alcohol and marijuana before becoming involved in the crime.

The district court concluded that this claim was procedurally barred because Drew did not present it to the trial court by objecting to the statute, objecting to the charge, or requesting a special jury instruction. Since the district court's decision, the Court of Criminal Appeals has held that failure to object does not waive a petitioner's right to assert a Penry claim. See Selvage v. Collins, 816 S.W.2d 390, 392 (Tex. Crim. App. 1991). Therefore, we consider the merits of this claim.

In Penry, the Supreme Court held that when certain mitigation evidence is presented, the Texas capital sentencing scheme must be supplemented with special instructions so that Texas juries can give full mitigating effect to this evidence. 492 at 328. This court recently addressed the scope of Penry in Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992), cert. granted, ___ S. Ct. ___, 1992 WL 52201 (U.S. June 8, 1992). We concluded that special jury instructions are required only when the "major mitigating thrust of the evidence is beyond the scope of all of the special issues." Id. at 1027. Penry disability evidence

18

"can reduce culpability where it is inferred that the crime is attributable to the disability."  Id. at 1033.

Drew maintains that the jury could not give full effect to (1) evidence of his troubled childhood,[8] (2) evidence of his drinking problem, (3) evidence that Drew was under the influence of alcohol and marijuana at the time he committed the crime, (4) his comparative youth at the time of the killing (Drew was twenty-three years old when he committed the crime), and (5) evidence that Drew did not strike the fatal blow.

In Graham, we noted that evidence of the adverse effects of a troubled childhood might well raise a Penry claim.  Id.  Like Graham, however, Drew presented "no evidence of any effect this had on [him], or of any reaction on his part to it, and no attempt was made even to explore the subject."  Id.  As a result, we conclude, as we did in Graham, that the Texas special issues adequately addressed the evidence of Drew's childhood problems.

With regard to Drew's drinking problem, the state habeas court found that "[a]lthough counsel placed evidence of [Drew's] drinking problem before the jury, counsel refrained from giving that issue too much evidence since (1) the evidence clearly did not support a temporary insanity defense; and (2) counsel reasonably believed that such evidence would not be perceived by the jury as mitigating evidence."  In view of the meager evidence

---

[8] Martelle testified that Drew's early childhood was marred by repeated fights between his parents.  Drew's parents divorced and abandoned him when he was very young, leaving him to be raised by his grandparents.

19

in the record of Drew's drinking problem, we conclude, under Graham, that its major mitigating thrust was substantially within the scope of the Texas special issues.

Whatever the point at which age can no longer be considered as youth for mitigation purposes, Graham expressly forecloses Drew's argument on this ground:

> [W]hatever is mitigating about youth tends to lend support to a "no" answer to the second special issue, and its tendency to do so is essentially proportional to the degree to which the jury concludes such factors were influential in the defendant's criminal conduct. The greater the role such attributes of youth are found to have played in the defendant's criminal conduct, the stronger the inference that, as his youth passes, he will no longer be a danger to society.

950 F.2d at 1031. The Texas capital sentencing scheme allowed the jury sufficiently to consider youth as a mitigating circumstance. Furthermore, as to Drew's evidence that he was under the influence of alcohol and marijuana at the time of the crime, we rejected a nearly identical contention in Cordova, concluding that "voluntary intoxication is not the kind of 'uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own' that requires a special instruction to ensure that the mitigating effect of such evidence finds expression in the jury's sentencing decision." Cordova, 953 F.2d at 170 (quoting Graham, 950 F.2d at 1029). Finally, the first special issue[9] squarely addresses the evidence that Drew

_____

[9] The first special issue asks the jury: "Was the conduct of the defendant that caused the death of the deceased committed

20

did not actually kill the deceased.  See Johnson v. McCotter, 804 F.2d 300, 302 (5th Cir. 1986), cert. denied, 479 U.S. 1071 (1987).   Accordingly, this claim is without merit.

E. Thirty-Day Rule

Several months after Drew was sentenced, Puralewski recanted his earlier statements faulting Drew for Mays' killing.  On March 28, 1984, Puralewski executed an affidavit taking sole responsibility for Mays' death.  Based in part on Puralewski's recantation, Drew moved the trial court for a new trial.  The trial court rejected the motion on the ground that it lacked jurisdiction to consider claims filed after the thirty-day time limit imposed by Texas Code of Criminal Procedure Article 40.05. On direct appeal, the Court of Criminal Appeals held that Article 40.05 created a jurisdictional bar to Drew's untimely motion. Drew argues that the version of Article 40.05 in effect at the time of his trial[10] precluded the consideration of crucial evidence of his innocence of the capital crime in violation of his Eighth and Fourteenth Amendment rights.

In addition to its jurisdictional holding, the Court of Criminal Appeals thoroughly considered the factual allegations supporting Drew's motion for new trial.[11]  See Drew v. State, 743

---

deliberately and with the reasonable expectation that the death of the deceased would result?"  Tex. Code Crim. Proc. Ann. art 37.071(b)(1).

[10] Tex. Code Crim. Proc. Ann. art 40.05 (Vernon 1981) (repealed effective September 1, 1986).

[11] The court made this inquiry in response to Drew's alternative argument on direct appeal that state law required the

21

S.W.2d at 226-29.  The Court of Criminal Appeals observed that
Puralewski's recantation was totally inconsistent with the bulk
of the testimony presented at Drew's trial.  The Court of
Criminal Appeals found, moreover, that Puralewski's recantation
contradicted "his previous statements given which implicate the
appellant in the murder and which are generally consistent with
the trial testimony."  Id. at 228.  The Court of Criminal Appeals
further noted that the statement was not contrary to Puralewski's
penal interest, since he had already been sentenced to sixty
years' imprisonment based on his guilty plea when he made the
statement.  Based on these findings, the Court of Criminal
Appeals implicitly determined that Puralewski's recantation
lacked credibility and concluded that the trial court did not
abuse its discretion in determining that Drew's newly discovered
evidence was not "such as would probably bring about different
results upon a new trial."  Id. at 229 (citing United States v.
Vergara, 714 F.2d 21, 23 (5th Cir. 1983) (district court may deny
new trial, even without an evidentiary hearing, if it determines
that a previously silent accomplice's willingness after
conviction to exculpate his convicted co-conspirator is not
credible or would not be sufficient to produce a different
result)).

---

trial court to consider his motion because "where an accused's
constitutional rights are in conflict with a valid procedural
rule of law the procedural rule must yield to the superior
constitutional right."  Drew v. State, 743 S.W.2d at 224 (citing
Whitmore v. State, 570 S.W.2d 889, 898 (Tex. Crim. App. 1977).

Drew contends that he was entitled to have the merits of his motion for a new trial considered and that his constitutional rights were violated because the state did not provide a procedural vehicle for such a consideration. We will assume, _arguendo_, that Drew's contention is cognizable under § 2254. In view of the extensive state court findings, Drew's claim is distinguishable from that raised in <u>Herrera v. Collins</u>, No. 91-7146 (cert. granted Feb. 19, 1992). In <u>Herrera</u>, no state court confronted the petitioner's evidence of innocence. <u>See</u> <u>Herrera v. Collins</u>, 954 F.2d 1029, 1034 (5th Cir. 1992). Here, in contrast, the Court of Criminal Appeals made specific findings relating to the evidence supporting Drew's motion for new trial and rejected the motion on the merits. Whatever the ultimate determination in <u>Herrera</u> may be, the statutory thirty-day deadline on motions for new trial did not foreclose consideration of Drew's newly discovered evidence. Therefore, we conclude that this claim lacks merit.

## F. Ineffective Assistance of Counsel

Drew cites several instances to demonstrate that his trial counsel rendered constitutionally ineffective assistance. We review ineffective assistance of counsel claims under the two-prong standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u>, <u>e.g.</u>, <u>Wilkerson v. Collins</u>, 950 F.2d 1054 (5th Cir. 1992). To meet this standard, a defendant must show:

> First . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

23

> guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show
> that the deficient performance prejudiced the
> defense.  This requires showing that
> counsel's errors were so serious as to
> deprive the defendant of a fair trial, a
> trial whose result is reliable.  Unless a
> defendant makes both showings, it cannot be
> said that the conviction or death sentence
> resulted from a breakdown in the adversarial
> process that renders the result unreliable.

Strickland, 466 U.S. at 687.

Courts must evaluate attorney performance from the circumstances of the challenged conduct and from counsel's perspective at the time to assess whether the representation "fell below an objective standard of reasonableness."  Id. at 688-89.  Further, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  A defendant demonstrates prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. In the capital sentencing context, courts inquire into "whether there is a reasonable probability that, absent the errors, the sentencer--including the appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695.

24

Drew first contends that he was deprived of his Sixth Amendment rights because his trial counsel failed to interview and subpoena witnesses who could provide valuable mitigating evidence. "[F]ailure to present mitigating evidence 'if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed'" under Strickland. Wilkerson, 950 F.2d at 1065 (quoting Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985)). The state habeas court found that Drew either failed to inform counsel of the existence of the three witnesses or Drew personally contacted them and they would not testify. This finding is amply supported by the record, and thus is entitled to a presumption of correctness pursuant to § 2254(d).[12]

Second, Drew asserts his counsel was ineffective for failing to request a psychiatric interview even though counsel knew that Drew had a serious drinking problem and a troubled childhood. The state habeas court found that counsel made reasonable inquiries into Drew's mental state, inquiring into whether Drew had any past psychological problems or mental illness, and whether he had ever been admitted to a mental hospital or

---

[12] "Although the ultimate question of whether or not counsel's performance was deficient is a mixed question of law and fact, state court findings made in the course of deciding an ineffectiveness claim are subject to the deference requirement of section 2254(d)." Loyd v. Smith, 899 F.2d 1416, 1425 (5th Cir. 1990). A state court need not conduct a live evidentiary hearing to be entitled to this presumption; it can evaluate an ineffective assistance of counsel claim based on the affidavits of the petitioner and the attorney. Carter v. Collins, 918 F.2d 1198, 1202 (5th Cir. 1990).

25

drug/alcohol rehabilitation center.  Counsel also observed that Drew appeared to understand the charges against him and assisted in the preparation of his own defense.  The record shows that counsel was not unreasonable for failing to conduct further investigation concerning Drew's psychological status.  We find no merit to Drew's claim.

Third, Drew argues that his counsel misunderstood and misstated the law of capital murder.  The state habeas court found that "the final argument made by defense counsel demonstrates that counsel had more than an adequate understanding of the law of capital murder."  Although counsel may have made ambiguous statements about the law, the record as a whole supports the finding of the state habeas court.  We therefore reject this contention.

Fourth, Drew maintains that counsel's failure to object to the prosecutor's inflammatory closing argument constituted ineffective assistance.  A decision not to object to a closing argument is a matter of trial strategy.  We will not disturb the state habeas court's conclusion that defense counsel's failure to object at closing "did not deny [Drew] reasonably effective assistance of counsel as guaranteed by the Sixth Amendment . . . ."

Fifth, Drew contends that his counsel's failure to use due diligence in obtaining the testimony of Puralewski deprived him of his right to effective assistance of counsel.  The state habeas court found that counsel made efforts to speak with

26

Puralewski, but that Puralewski refused to speak with him, and informed Drew's counsel that he would invoke his Fifth Amendment privilege against self-incrimination if he were called to testify at Drew's trial. The habeas court also found that Puralewski had given statements to law authorities denying any involvement in the crime. Drew concedes that Puralewski would have invoked the Fifth Amendment if he had been called to testify at Drew's trial. We agree with the district court that Drew does not demonstrate that he received ineffective assistance of counsel on this ground.

Finally, Drew argues that his counsel provided ineffective assistance by failing to conduct post-trial interviews with the jurors. The district court observed that while defense counsel did not conduct extensive interviews, the record shows that counsel did interview the jurors after trial and failed to discover any misconduct. We agree with the district court that counsel's actions did not fall below an objective standard of reasonableness. Nor, for reasons explained above, does Drew demonstrate any prejudice resulting from counsel's failure to discover that the jurors had discussed parole law. As a result, we conclude that this claim lacks merit.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Drew's petition for a writ of habeas corpus.