IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2008

Charles R. Fulbruge III
Clerk

No. 07-30024

DAVID MAHLER,

Petitioner-Appellant,

v.

BARON KAYLO, Warden, Avoyelles Correctional Center,

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, HIGGINBOTHAM, and ELROD, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

David Mahler appeals the district court's denial of his 28 U.S.C. § 2254 petition challenging his manslaughter conviction. The district court granted Mahler a certificate of appealability on the issue of whether the State of Louisiana violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide him with certain pretrial witness statements that either contradicted or were inconsistent with the trial testimony. Because we conclude that the State did violate its Brady obligations, we reverse the district court's denial of Mahler's writ of habeas corpus and remand with instructions to grant it.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 30, 1997, Craig Zimmer attended the Venetian Isles Fishing Rodeo. At about midnight, a fight broke out in which Nicholas Mahler punched Zimmer. Later that night, Zimmer and several of his friends went to the Mahler camp where they met not only Nicholas Mahler, but also his father, Christopher Mahler, and his uncle, David Mahler. Shortly thereafter, Christopher Mahler armed himself with a shotgun while David Mahler retrieved a .25 caliber pistol from his truck. Ultimately, David Mahler shot Zimmer in the back.

After arriving at the scene, New Orleans Police Detective Beverly Gunter learned from witnesses that the incident had involved two groups: Mahler family members and Zimmer and his friends. Detective Daniel Wharton, Gunter's partner and the lead investigator of the shooting, arrived soon after and collected evidence, directed photography of the location, and interviewed twelve witnesses. At trial, Wharton identified pictures of the scene, the bullet retrieved during Zimmer's autopsy, Zimmer's shirt with a bullet hole in the left back area, the .25 caliber pistol that fired the fatal shot, and the shotgun confiscated from Christopher Mahler.

Several of Zimmer's friends testified at trial that they encountered Nicholas Mahler, Christopher Mahler, and David Mahler upon arriving at the Mahler camp. According to this testimony, after an exchange of words, Nicholas Mahler punched Terrance John (T.J.) Willis, a friend of Zimmer's, in the back of the head and then ran behind his father, Christopher Mahler, who was armed with a shotgun. At that point, while the shotgun was pointed at Willis, Zimmer entered the fray and pushed the shotgun away from Willis. As Zimmer turned away, David Mahler stepped forward and shot him in the back.

In contrast, Christopher Mahler testified that, after the punch was thrown, Zimmer approached him, grabbed the shotgun, and attempted to wrest it from him. It was during this struggle for the shotgun that, according to Christopher Mahler, David Mahler shot Zimmer. David Mahler's testimony

corroborated his brother's version of events. According to David Mahler, he fired his gun in the direction where the struggle for control of the shotgun was taking place and, thereafter, saw Zimmer on the ground.

At the conclusion of the trial, the jury convicted David Mahler of manslaughter, and he received a sentence of twenty years in prison. After exhausting his direct appellate remedies, he filed an application for post-conviction relief with the state district court. The only claim at issue here is his allegation that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide him with certain witness statements obtained by police investigators. Mahler asserted that, prior to trial, he asked the prosecution to disclose any exculpatory evidence and/or evidence favorable to his defense, but the prosecution failed to disclose witness statements which (i) supported his claim that he shot Zimmer in self-defense (and/or defense of others), and (ii) could have been used to impeach the trial testimony of several prosecution witnesses. He further asserted that several prosecution witnesses indicated in their pretrial statements (i) that Zimmer was wrestling or struggling with Christopher Mahler over the shotgun when the shooting occurred, and (ii) that the scene was hostile and volatile.

David Mahler specifically pointed to pretrial statements taken from Brett Schurr, Mark Schurr, T.J. Willis, James Amato, Brian McKean, and Damian Burtlett, as well as to two supplemental police reports. These statements indicate that Zimmer was either wrestling with Christopher Mahler over the shotgun or attempting to get to Nicholas Mahler, who was standing behind Christopher Mahler, at the time of the shooting. At trial, however, prosecution witnesses stated that Zimmer's interaction with Christopher Mahler had ended, and that Zimmer was in the process of turning away from Christopher Mahler when David Mahler shot him. David Mahler also asserted that, at trial, these witnesses downplayed the hostile environment.

After conducting an evidentiary hearing and reviewing the relevant parts of the record, the state trial court denied the application for post-conviction relief based on the following reasoning:

> . . . [M]uch has been made of the idea of the presence of the word 'struggle' in the pretrial preliminary statements given by certain witnesses to the police, the word 'struggle,' the specific word, and then the lack of that word during the transcripts at trial.
>
> The question [is whether] the failure to present a statement wherein initially someone described what they allegedly perceived as being a struggle, and yet failed to use that word in describing what they allegedly observed before the Jury, a violation of Brady and the cases that follow, when what was offered at trial clearly gave the Jury a sense that there was indeed a struggle.
>
> I think the Jury left the room here at the end of this proceeding clearly understanding that there was a struggle; clearly understanding that a group of young men found themselves continuing what originally was a minor misunderstanding, a minor offensive action, perhaps, in the eyes of some of the parties, that carried over.
>
> * * * *
>
> . . . I think the Jury clearly understood that there was a great deal of – of pushing, shoving, fighting, words that were said, verbal assaults that were rendered on both sides, and physical contact made between the parties from both sides,
>
> I think clearly without having heard the word 'struggle' repeated by any of the witnesses who did testify at trial, who used that specific word in their statements to the police, I think not having heard that word did not cause the Jury to [fail to] conclude that indeed a struggle or series of struggles and heated exchanges did indeed occur.
>
> Did the District Attorney withhold favorable evidence that rises to a material level of importance? That's the ultimate question that the Court has to answer. That's the only question the Court has to be concerned with and is concerned with because that's what the law says I must be concerned with.
>
> The law provides us with an instruction. It says that, '[t]he evidence is material only if it's reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the Defense.' . . .
>
> A reasonable probability is one which is sufficient to undermine confidence in the outcome of the case. And the Court is ultimately called upon to conduct what the law requires and

4

describes as a cumulative evaluation of all of the evidence and/or the lack of evidence, including anything that was allegedly withheld, anything that was not presented, anything that was not mentioned, anything that was not put before the Jury.

Having attempted to do that in a fair and reasonable way, I find that the defendant's rights were in no way violated. I deny this writ.

David Mahler's state post-conviction proceedings ended when the Louisiana Supreme Court, without setting forth supporting reasons, denied his writ application.

Mahler then filed the instant 28 U.S.C. § 2254 petition, wherein he reiterated, among other claims, the same Brady arguments he made in his application for post-conviction relief in state court. The magistrate judge issued a report recommending denial of the petition with prejudice. Regarding the Brady claim, the magistrate judge reviewed the state habeas trial court's finding that the testimony offered at trial left the unmistakable impression that a struggle had preceded the fatal shooting and presumed the finding to be correct as permitted by 28 U.S.C. § 2254(e)(1). The magistrate judge ultimately concluded that the suppressed pretrial statements were properly categorized as cumulative evidence rather than as material evidence, and that, accordingly, they did not violate Mahler's due process rights.

Mahler objected to the magistrate judge's report and recommendations. The district court overruled Mahler's objections, adopted the report, and dismissed his § 2254 petition with prejudice. Mahler then requested, and the district court later granted, a certificate of appealability solely on his Brady claim.

## II. DISCUSSION

Mahler contends that the State violated his due process rights under Brady by failing to provide him with certain pretrial witness statements that were inconsistent with the trial testimony, and that as a result, the district court erred in denying his § 2254 petition. Because Mahler filed his habeas petition

after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, his petition is governed by the procedures and the standards provided therein. Parr v. Quarterman, 472 F.3d 245, 251–52 (5th Cir. 2006), cert. denied, 127 S. Ct. 2974 (2007). The AEDPA establishes a deferential scheme for use in reviewing claims in a state prisoner's habeas corpus application that were adjudicated on the merits in state court proceedings. See 28 U.S.C. § 2254(d); see also Hill v. Johnson, 210 F.3d 481, 484–85 (5th Cir. 2000) (explaining deferential scheme). Under 28 U.S.C. § 2254(d)(1)–(2), a federal court may not grant habeas relief on such claims unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A state court decision involves an unreasonable application of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams v. Taylor, 529 U.S. 362, 407–08 (2000). It is not enough that the state court decision applied the law erroneously or incorrectly; rather, the application of the principle must be "objectively unreasonable." Id. at 409–11. Also, state court factual determinations are "presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also 28 U.S.C. § 2254(e)(1).

The clearly established law at issue in this proceeding was first enunciated by the Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963). Under Brady, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. This duty to provide favorable evidence includes impeachment evidence

as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985), and obligates the "individual prosecutor . . . to learn of any favorable evidence known to the others acting on the government's behalf . . . [,] including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). The duty applies, moreover, even when the accused fails to specifically request such evidence. Strickler v. Greene, 527 U.S. 263, 280 (1999); see also Kyles, 514 U.S. at 433; Dickson v. Quarterman, 453 F.3d 643, 647 (5th Cir. 2006); Johnson v. Dretke, 394 F.3d 332, 336 (5th Cir. 2004).

Accordingly, to prevail on his Brady claim, Mahler "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material" to his guilt or punishment. Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) (citing Drew v. Collins, 964 F.2d 411, 419 (5th Cir. 1992)). Of these three elements, the one at issue here, materiality, is generally the most difficult to prove. Evidence is "material" only when there exists "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. The materiality determination is a mixed question of law and fact. Summers v. Dretke, 431 F.3d 861, 878 (5th Cir. 2005).

The Supreme Court elaborated on this materiality standard in Kyles, explaining that "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). As such, the Court clarified, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence," id., or whether, "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434–35. In addition, the Court emphasized that the reviewing court applies the materiality inquiry to the withheld evidence "collectively, not item by item," id. at 436, and that, if the evidence is material, "there is no need for further harmless-error

review." Id. at 435. Applying these principles to the present case, and with due regard to the deferential standard of review required by the AEDPA, this court holds that the state trial court unreasonably applied clearly established federal law to the facts of Mahler's case in determining that the witness statements at issue were not material.

Following the evidentiary hearing, the state trial court correctly articulated the standard for determining materiality under Brady, noting that "'evidence is material only if it's reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the Defense,'" and that "the Court is ultimately called upon to conduct what the law requires and describes as a cumulative evaluation of all of the evidence and/or the lack of evidence . . . ." In applying this standard, however, the state trial court focused solely and unreasonably upon whether the trial testimony gave the jury a sense that a "struggle" or a "series of struggles and heated exchanges" had occurred at some point during the confrontation between the two groups. This determination was inapposite to the question at the heart of Mahler's defense—namely, whether the struggle was ongoing at the time of the shooting or whether the struggle had ended and Zimmer had turned away from Mahler in the direction of the truck by the time the shooting occurred. Yet it is precisely that question that several[1] of the suppressed pretrial statements, in direct contrast to the prosecution witnesses' trial testimony, would have answered in the negative.

Indeed, at trial Brett Schurr testified as follows:

Once [Christopher Mahler] had the gun on – on T.J. [Willis], Craig [Zimmer] ran over there and shoved him away and as Craig was turning back to the truck David Mahler came from behind him and

---

[1] We agree with the State that Brian McKean's and Damian Burtlett's pretrial statements, offered to support the existence of a hostile atmosphere at the time of the shooting, are immaterial to the central question identified above; accordingly, we do not address those statements.

shot him in the back.

In his statement to police, however, Brett Schurr said that Zimmer was actively wrestling with Christopher Mahler at the time of the shooting and made no mention of Zimmer turning back to the truck:

> And the man with the shotgun come up to Craig with the gun, comin' towards 'im, and . . . . When Craig was wrestlin' . . . like, wrestlin' with him with the gun, cause he came toward him . . . the other man [David Mahler] came with the little black pistol and shot him.
>
> Q. So Craig was wrestlin' with the guy with the shotgun?
> A. The guy that approached him, was approachin' him with it, and Craig was tryin' to break up the fight. And he started approachin' Craig and then that other man jus' came from nowhere and came from like on the side of him. And jus' . . . shot him.
>
> \* \* \* \*
>
> And then Craigy went to break 'em up, and the man with the shotgun was approachin' Craigy, and Craigy was, you know, pushin' 'im back, like tryin' to push him away and then the other man came and shot him.
>
> \* \* \* \*
>
> Q: So Craig was wrestlin' with one guy and another guy came up and shot 'im?
> A. Yes sir.
> Q. Okay.
> A. He was gettin' the man off . . . tryin' to get the man off . . . .

Mark Schurr also provided contradictory accounts of the shooting. At trial, he provided this testimony:

> And then Craigie [Zimmer] was next – Craigie was on the right. I was on the left. I had moved around the bush already, so I am on the left hand side, and that's when Craigie pushed the shotgun in the arms of Chris Mahler to get it pointed off of T.J. [Willis] and when he pushed the gun off of him he turned and it looked like he was headed towards his truck while he was turning. Then that's when Dave Mahler pointed the gun, walked up and shot Craigie.

Yet in his statement to police, Mark Schurr said that Zimmer had been walking behind T.J. Willis toward Nicholas Mahler when the gun was fired; Mark Schurr

9

never stated that Zimmer had turned around to head toward the truck prior to the shooting:

> . . . Craigy [Zimmer] and T.J. [Willis] walked towards Nicky [Mahler] and then that's when the man pulled out the gun . . . from his side . . . not pulled it out, but jus' . . . withdrew it, and shot Craigy.
>
> * * * *
>
> Q. So . . . was Craigy and uh, T.J. approachin' [Nicholas Mahler]?
> A. T.J. was approachin' him and Craigie walked up to back . . . like to back T.J. up, you know, to make sure that nothin' happens to him . . . .
>
> * * * *
>
> . . . because once that one punch was thrown, T.J. got mad, wanted to fight [Nicholas Mahler] . . . Craigy was behind [T.J.] . . . the crowd went forward, [David Mahler] pulled the gun and shot Craigy right in the chest.
>
> * * * *
>
> Q. Craig was approachin' . . .
> A. Craig was walking behind . . .
>
> Q. Towards . . .
> A. Like I was . . . I could've been shot . . .
>
> Q. [Craig Zimmer] was walkin' behind T.J.?
> A. I was . . . on the left of T.J., Craigy was on the right of T.J.
>
> Q. Sayin' Craigy was walkin' behind T.J. and T.J. was approaching Nick?
> A. T.J. was approachin' Nick, because he jus' got hit from Nick.

T.J. Willis likewise provided inconsistent statements regarding whether Zimmer had turned away at the time of the shooting. In court, he testified, "after Craig [Zimmer] pushed the gun down and away he turned to run and David Mahler aimed the .25 caliber into his back and shot him." But in his earlier statement to police, Willis said that Zimmer was in the process of confronting Nicholas Mahler when the gun fired, without any indication that Zimmer had ever turned to run:

10

. . . Craig [Zimmer] saw Nick Mahler [hit] me. So . . . he, he was gonna confront Nick Mahler. And as he was gonna confront Nick Mahler, his dad[2] grabbed [Craig Zimmer] and shot him on the side the uh, on shot . . . by his uh, rib area on the lungs.

Similarly, James Amato's earlier statement to police described an ongoing altercation at the time of the shooting; at no point did he say or imply that Zimmer had ever turned away to run or head toward the truck:

> Q. So Craig [Zimmer] wrestled with the man with the shotgun?
> A. He was . . . I don't . . . know if I'd call . . . it wrestlin' . . . cause it, it happened so fast. I mean . . . like, I think he was either pullin' at T.J. [Willis] or whatever. And [Craig Zimmer] grabbed . . . and they grabbed the gun. As soon as I heard [Craig Zimmer] grab the gun, I thought the shotgun went off.
>
> * * * *
>
> Q. Both of 'em [Craig Zimmer and T.J. Willis] had hold of the gun?
> A. Yeah. Right.

Although Amato did not testify at trial, he could have been subpoenaed had his statement been disclosed to the defense.

Finally, the supplemental police reports do not reflect that either Chad Nichols or Jason Martin ever told police that Zimmer had turned away prior to the shooting. Nevertheless, at trial Nichols testified as follows:

> Q. . . . What happened once you saw Christopher Mahler with the shotgun?
>
> A. Well, he pointed it towards T.J. [Willis] and that's when Craig [Zimmer] left the side of his truck and went to go push the gun away where he wouldn't shoot T.J.
>
> * * * *
>
> . . . after [Christopher Mahler] did that we walked towards the front of the truck and that's when David Mahler came and Craig was turning away. As Craig turned, that's when he got shot.

In addition, Martin testified at trial that:

---

[2] In this statement, Willis mistakenly refers to David Mahler as Nicholas Mahler's "dad" instead of as his uncle.

11

. . . [w]hen Chris [Mahler] had the shotgun on T.J. [Willis], Craig [Zimmer] was standing in his doorway of his truck and walked over there and stepped his self, his body in between the shotgun and T.J. And he grabbed Christopher by the arms and shoved the shotgun over. And at that time Craig turned his back to get away and that's when I – I seen the shotgun come up and it went off[3] . . . .

Contrary to the state trial court's conclusion, the withheld pretrial statements do not merely reinforce the fact established at trial that a "struggle" had occurred at some point before Mahler shot Zimmer.[4] Rather, when considered collectively, they suggest that Zimmer's struggle with Christopher Mahler for the shotgun was an ongoing event—the outcome of which remained uncertain—when the shooting occurred. This stands in stark contrast to the picture painted by the prosecution witnesses' trial testimony that the struggle had conclusively ended and Zimmer had already turned away to run or head toward his truck before Mahler shot him. As a result, we hold that the statements could have been used for impeachment purposes and that, given their centrality to Mahler's defense, there exists "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

Factually similar Supreme Court and Fifth Circuit precedent supports this conclusion. In Giglio v. United States, for example, the Court reversed the defendant's conviction and remanded for a new trial under Brady because the prosecutor failed to disclose a leniency promise to a principal witness. 405 U.S. 150, 152, 154–55 (1972). The Court noted that "[w]hen the 'reliability of a given

---

[3] Testing by firearms expert Officer Kenneth Leary proved conclusively that David Mahler's .25 caliber pistol, not Christopher Mahler's shotgun, fired the bullet removed from Zimmer's body.

[4] We thus reach our conclusion presuming, as we must under 28 U.S.C. § 2254(e)(1), the correctness of the state trial court's factual finding that the trial testimony left the unmistakable impression that a "struggle" preceded the fatal shooting. In the state habeas proceeding, the trial court did not explicitly address whether Zimmer had turned away to head toward his truck at the time of the shooting or whether he was still engaged in a struggle.

witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of Brady]." Id. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). The Court then determined that because "the Government's case depended almost entirely on [the co-conspirator's] testimony" and because his "credibility as a witness was therefore an important issue in the case," the suppression was material and "the jury was entitled to know about it." Id. at 154–55.

Similarly, in Kyles, the Court reversed a defendant's conviction and remanded for a new trial based on a Brady violation. 514 U.S. at 454. There, the Court found it material that the prosecutor withheld statements of pivotal witnesses and an informant (who were not called to testify) because those statements had substantial impeachment value. Id. at 441. Given that "'the essence of the State's case' was the testimony of eyewitnesses," the Court observed, "[d]isclosure of the[] statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." Id.

Finally, in Graves v. Dretke, the Fifth Circuit reversed the district court's denial of the petitioner's writ of habeas corpus upon finding the materiality standard satisfied in part because the State withheld two statements of a key witness that were inconsistent with the witness's trial testimony. 442 F.3d 334, 344 (5th Cir. 2006). The court emphasized that the statements were "particularly important" given that the only physical evidence tying the petitioner to the charged murder was inconclusive and that the State's "case depended on the credibility of [the witness]" and "on the jury accepting [his] testimony." Id. at 340–41, 344–45.

The State's case against Mahler likewise depended on the reliability of the very witnesses whose pretrial statements were suppressed. The parties did not dispute that the .25 caliber pistol seized from Mahler on the night of the

13

shooting fired the bullet retrieved from Zimmer's body. Nor was the fact that Mahler shot Zimmer in the back at issue. Rather, what the two sides contested, and what was integral to Mahler's defense, was whether Zimmer was still struggling with Christopher Mahler at the time of the shooting or whether Zimmer had stopped fighting and had turned away to head toward his truck before he was shot.[5] Given that the suppressed statements directly undermine the prosecution witnesses' testimony that the struggle had ended and that Zimmer had turned toward his truck before David Mahler shot him, the jury was entitled to know of the withheld evidence in making its credibility determinations.

In reaching this conclusion, moreover, we note the weight placed by the magistrate judge's report, adopted by the district court, on the fact that the bullet entered Zimmer's back. Based on this physical evidence, the magistrate judge reasoned that "regardless of exactly when a struggle took place in proximity to when the shooting occurred, it is clear that at some point prior to the shooting the victim had, in fact, turned away from the shooter." Again, however, this focus misapprehends the relevant inquiry. The pertinent point is not whether Zimmer had turned his body away at some time before the shooting; the pertinent point is whether, as the prosecution witnesses testified, Zimmer had intentionally turned away as though he were headed back to his truck, or whether, as the withheld statements indicate, he had remained engaged in a continuing struggle when he was shot. It was the defense's inability to make that distinction to the jury through the suppressed impeachment evidence that

---

[5] This is not a case, therefore, in which the nondisclosed impeachment evidence was immaterial because corroborating evidence rendered it merely cumulative. See Kyles, 514 U.S. at 451 (noting that "[i]t is significant . . . that the physical evidence [apart from the withheld statements] would . . . hardly have amounted to overwhelming proof that [the defendant] was the murderer"); cf. Dickson v. Quarterman, 462 F.3d 470, 478 (5th Cir. 2006) (holding that the state court's determination of immateriality regarding the prosecutor's failure to disclose potential impeachment evidence was not an "unreasonable application" of federal law under the AEDPA in light of the "other probative evidence" offered at trial).

undermines our confidence in the outcome of the case.

## III. CONCLUSION

For the foregoing reasons, the district court's judgment is REVERSED and the case is REMANDED with instructions to GRANT the writ of habeas corpus unless the State of Louisiana proceeds to retry Mahler within a reasonable time.